**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**


DORIS FREYRE,

           **COMPLAINT**

       Plaintiffs,

v.


HILLSBOROUGH COUNTY SHERIFF'S
OFFICE, NEXTGEN ALLIANCE, INC..;
STATE OF FLORIDA, IRIS C. VALDEZ;
JESSICA PIETRZAK, JULIE EMERSON;
ALEXIS ARGERIOUS, ANGELINE
ATTILA, JILL ADAMS, TIFFANY
SHORT,  and CRESHANDA RILEY

       Defendants.

_____/

    Plaintiff, Doris Freyre, by and through undersigned counsel, sues the Defendants,

HILLSBOROUGH COUNTY SHERIFF'S OFFICE, NEXTGEN ALLIANCE, INC., STATE

OF FLORIDA, IRIS C. VALDEZ, JESSICA PIETRZAK, JULIE EMERSON, ALEXIS

ARGERIOUS, ANGELINE ATTILA, JILL ADAMS, TIFFANY SHORT, CRESHANDA

RILEY, and allege as follows:

    1.    The Supreme Court of the United States has long held that parents have a

constitutionally protected liberty interest in the care, custody and management of their children.

Indeed, a mother's interest in the care, custody and control of her child is perhaps the oldest of

the fundamental liberty interests recognized by the Supreme Court.  This matter involves state

actors removing and institutionalizing a child with a disability from her mother, solely because

of her mother's disability and without due process as required by law.  Such removal and institutionalization directly led to the death of the child with a disability.

2.      This Court has original jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Federal Civil Rights Act, 42 U.S.C § 1983, for violations of the Fourth and Fourteenth Amendments to the United States Constitution.  In this action, Plaintiff was injured and now seek damages.

3.      Defendant HILLSBOROUGH COUNTY SHERIFF'S OFFICE (HCSO) a political subdivision of the State of Florida and a municipality organized pursuant to the laws of the State of Florida, may sue and be sued, and is a person within the meaning of 42 U.S.C. § 1983.

4.      HILLSBOROUGH COUNTY SHERIFF'S OFFICE is a public entity pursuant to 42 U.S.C. § 12131, and is subject to the provisions of Title II of the Americans with Disabilities Act.

5.      HILLSBOROUGH COUNTY SHERIFF'S OFFICE is a recipient of federal financial assistance, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

6.      At all times material hereto, HILLSBOROUGH COUNTY SHERIFF'S OFFICE was the lead agency for the investigation of dependency actions and provider of protective services  in Hillsborough County, Florida, pursuant to § 409.1671, Florida Statutes, and operated

_____

under a contract with the State of Florida Department of Children and Families (DCF) to provide

such services to children in Hillsborough County.

7.     Defendant, STATE OF FLORIDA is a public entity pursuant to 42 U.S.C. §

12131, and is subject to the provisions of Title II of the Americans with Disabilities Act.

8.     Defendant STATE OF FLORIDA is a recipient of federal financial assistance,

and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. §

794.

9.     Defendant, JESSICA PIETRZAK, was the Child Protective Investigator,

(hereinafter referred to as CPI PIETRZAK), and she was employed with the Hillsborough

County Sheriff's Office (HCSO), and at all times is *sui juris*.

10.     Defendant IRIS C. VALDEZ, was the Child Protective Investigator Supervisor

(hereinafter referred to as CPI VALDEZ), and she was employed with the Hillsborough County

Sheriff's Office (HCSO), and at all times is *sui juris*.

11.     Defendant, IRIS C. VALDEZ (hereinafter "VALDEZ"), was a Child Protective

Investigator ("CPI") employed by HCSO, who, at times relevant hereto, investigated allegations

that M.F. was being abused and/or neglected by FREYRE, and was obligated to ensure the safety

and lawful placement of M.A.F.

12.     At all times relevant hereto, VALDEZ was obligated to comply with all State and

Federal laws and regulations as well as departmental/district procedures regarding children in

state care.

13.     Defendant, JESSICA PIETRZAK (hereinafter "PIETRZAK"), was a Child

Protective Investigator ("CPI") employed by HCSO, who, at times relevant hereto, investigated

_____

allegations that M.F. was being abused and/or neglected by FREYRE, and was obligated to ensure the safety and lawful placement of M.A.F.

14.     At all times relevant hereto, PIETRZAK was obligated to comply with all state and federal laws and regulations as well as departmental/district procedures regarding children in state care.

15.     Under state law, DCF contracts with private community based agencies and gives them the power to provide foster care and protective services to children in state custody. Under the current system, these agencies are integral to DCF's ability to carry out its public function and objectives.

16.     Defendant NEXTGEN ALLIANCE, INC. is a corporation organized and existing under the laws of Florida and operates its business primarily in Hillsborough County, Florida.

17.     Defendant NEXTGEN ALLIANCE, INC. changed their name from HILLSBOROUGH KIDS, INC. on July 26, 2013 and is therefore referred to as "HILLSBOROUGH KIDS, INC." or "HKI" in this complaint.

18.     Defendant HILLSBOROUGH KIDS, INC. is a recipient of federal financial assistance, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

19.     At all times material hereto, HILLSBOROUGH KIDS, INC was the lead agency for coordination and delivery of community-based foster care and related services in Hillsborough County, Florida, pursuant to § 409.1671, Florida Statutes, and operated under a contract with DCF to provide such services to children in the custody of DCF.

_____

20.     At all times material hereto, Defendant, HILLSBOROUGH KIDS, INC. was a corporation organized and existing under the laws of Florida and operates its business primarily in Hillsborough County, Florida. HILLSBOROUGH KIDS, INC. was obligated to provide case management services to children in foster care and under protective supervision in Hillsborough County, including M.A.F., and had ultimate responsibility to ensure that the needs of all foster children including the M.A.F.'s needs were met by establishing and using the means necessary to confirm and ensure that it did, in fact, meet M.A.F.'s needs.

21.     Defendant, CRESHANDA RILEY, was at all times material an employee of HILLSBOROUGH KIDS, INC, and is otherwise *sui juris*.

22.     Defendant, JULIE EMERSON, (NURSE EMERSON) was a nurse employed by Children's Medical Services (CMS), a Division of the Florida Department of Health, an executive agency of the STATE OF FLORIDA, and is otherwise *sui juris*

23.     Defendant, ALEXIS ARGERIOUS, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

24.     Defendant, ANGELINE ATTILA, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

25.     Defendant JILL ADAMS, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

_____

26.     Defendant TIFFANY SHORT, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

27.     At all times relevant hereto, IRIS C. VALDEZ, JESSICA PIETRZAK, JULIE EMERSON, ALEXIS ARGERIOUS, ANGELINE ATTILA, JILL ADAMS, TIFFANY SHORT,  CRESHANDA RILEY all had the ability, authority and the means to comply with all lawful orders and the requirement of statutes and the United States Constitution.  Each is being sued in her individual capacity.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because (a) the Defendants are in this judicial district, and (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring within this judicial district.

29.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable of right by jury.

30.     Plaintiff retained the Law Offices of Matthew W. Dietz, P.L. and has agreed to pay them a reasonable fee for their services.

**FACTS**

31.     DORIS FREYRE ("Freyre") is a resident of Hillsborough County, Florida, and is *sui juris*.

32.     Freyre is a person with a disability as defined by the Americans with Disabilities Act, 42 U.S.C. 12102.  Freyre is disabled due to a back injury and is classified as disabled by the

_____

Social Security Administration. Freyre has six herniated disks in her back from a car accident, and cannot lift more than ten pounds, suffering from carpel tunnel syndrome.

33.     From M.A.F.'s birth on October 30, 1996, until her death on April 27, 2011, Freyre was the mother of M.A.F.

34.     M.A.F. lived with severe mentally and physically disabilities, including cerebral palsy, congenital hydrocephalus, congenital bi-lateral hip dislocations, seizures and developmental delay. M.A.F. was non-verbal and required assistance with all daily living tasks. She could not feed herself, walk, or reposition herself. M.A.F. used a wheelchair or remained in bed 24 hours a day and required total lifting. M.A.F. had a shunt in place to provide fluid drainage from the brain.

35.     When M.A.F. died, she was in seventh grade and was receiving education through the home-bound educational program through the Hillsborough County School System; however, her intellectual ability was that of a three year old child.

36.     M.A.F. was unable to communicate verbally and used other means to communicate.  She enjoyed watching television, especially Spanish programming. She also enjoyed Spanish music. She seemed to understand Spanish and English verbal communication. Her eyes followed movements around her and she smiled and laughs when others address her or when watching children.

37.     For the fourteen years of M.A.F.'s life, Freyre was M.A.F.'s sole parent and caregiver, and had cared for M.A.F. with additional supports and caregivers provided by virtue of Home-Based Community-Based (HBCB) Medicaid Waiver, and other Medicaid services in

_____

her home.  Such services also included home health services, home-bound school, and physical and speech therapy.

38.     Until March 29, 2011, Freyre received home health care assistance in the home seven days a week, but did not have assistance in her home from midnight to 7:00 AM.

39.     On March 16, 2011, the Hillsborough County Sheriff's Office received a "false" report that Freyre, was not providing appropriate medical care for her child, M.A.F.   M.A.F.'s home health care employee, working for Maxim Home Healthcare, reported to HCSO, among other falsities, that FREYRE was reluctant to take her daughter to the hospital when she had a fever and was in pain.

40.     On March 21, 2011, as part of her investigation, CPI PIETRZAK had a telephone conversation with M.A.F. Care coordination nurse, NURSE EMERSON, and NURSE EMERSON relayed that Freyre "seems to be overwhelmed". She stated that the mother has a limited income which could cause problems of her not wanting to relinquish her rights to the child. She stated that there are concerns that mother is physically unable to care for the child once the home health aid is gone. She stated that there does not appear to be any indication that the family will get 24 hour care, and wrongfully stated that no other family or back up care exists for the child during those early morning hours. She stated that the child needs to have 24 hour care, but that the mother has refused to sign the child voluntarily into a facility that can permanently provide that care.

41.     As a result of this complaint, and based almost solely on the erroneous allegations of M.A.F.'s Home health care aid, on March 28, 2011, a multi-disciplinary staffing was held at Child Protection Team (CPT), attended by Maxim Clinical Supervisor Erin Thompson, CPT

_____

Child Protection Specialist Laura Dill, Children's Medical Services (CMS) Nurse Julie Emerson, CMS FHP Joanne White, HCSO CPI Jessica Pietrzak,  HCSO CPI General Manager Heather Grates, and the assistant attorney general, Children's Legal Services, Alexis Argerious.

42.     During the staffing it was learned that the home health care staff and the CMS Nurse had concerns for the safety of M.A.F.. They expressed concerns about medical neglect, as well as mental and physical abuse. Due to Freyre's disability, she was unable to lift or provide complete physical care for M.A.F.  Since she was unable to provide all of M.A.F.'s care, the Assistant Attorney General (AAG) concurred with probable cause to shelter M.A.F. based on prospective neglect of the child. The decision was made to shelter M.A.F. at Tampa General Hospital on March 29, 2011, until a medical foster home could be secured.

43.     On March 30, 2011, The State of Florida filed a petition in the Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County Florida to place M.A.F. into foster care because of alleged medical neglect.

44.     Freyre has always denied that she neglected or abused M.A.F. She reported she missed medical appointments because she did not want to take M.A.F. out and expose her to germs or inclement weather. She also stated that she was a better judge of M.A.F.'s medical condition and medical needs than others.

45.      At the shelter hearing, the Court (Judge Vivian Corvo) found that Freyre should be lauded for caring for her daughter for 14 years, and ordered that the child can be returned to the mother without further court order immediately after home health aide services were provided in the home from midnight to 7:00 A.M., but, until such time, Freyre was to receive unlimited visitation of her daughter.

_____

46.     During such hearing, there was no question that additional services were to be provided to Freyre, and that Freyre would be reunited with M.A.F. at her home. Judge Corvo stated, "Because this is a very unusual circumstance, and I you know, the child is totally disabled and being cared by her mother for 14 years. Just…we need to fix it."  The following was stated:

> MS. PARSONS with Hillsborough Kids, Inc. (HKI) on behalf of the State of Florida: I spoke with my supervisor, Hillary Shaughnessy (ph), and she said if that was an issue that we can utilize funds in order to hire a home health care agency to work with her for a short period of time; two weeks, three weeks and then work with her to try to get her connected to getting that paid through Medicaid, or something.
>
> THE COURT: Wonderful, wonderful. You just did an outstanding job for us. So can I shelter with the mom, with the department to provide services in the home between midnight and 7 a.m., and then we will we can all reconvene. Any objections to that by anyone? All right, this is what's going to happen. Your daughter is going to go back to the home, but I'm allowing the department to continue to come into your home and observe what's going on.
>
> MS. FREYRE: Okay
>
> THE COURT: They're going to hire somebody, to have someone in that home.
>
> MS. FREYRE: Okay
>
> THE COURT: Actually, I don't want her, I guess, to go the child to go home until you've hired somebody.
>
> MS. PARSONS: Okay
>
> THE COURT: All right. The child will go home once they have someone to be there from midnight to 7 a.m. And they're going to provide services to you. Let me suggest to you that you accept those services.
>
> MS. FREYRE: Yes
>
> THE COURT: Because if you don't,

_____

MS. FREYRE: I Accept

THE COURT: -- then I'm going to be compelled to remove the child.

47.     Following the Hearing, the HKI Resource Specialist, Kris Karstens, then made efforts to engage the additional home health care aids to cover the midnight to 7 AM time period. The Resource Specialist immediately found two local providers and HKI approved the pay request on April 8, 2011.

48.     On April 1, 2011, Maxim Director Susan Macy reported that HKI can apply for 24 hour home health care services through Medicaid again and that if she could get a letter written from the court, Medicaid may agree to pay for the additional hours.  No attempts were made to obtain a letter from the court to request the additional services.

49.     HKI Resource Specialist, Kris Karstens ensured that Freyre would have emergency back-up services in the event that a home health care aid failed to show for a scheduled shift.

50.     HKI failed to retain or pay for additional home health services for M.A.F., and M.A.F. remained at Tampa General Hospital.

51.     On April 11, 2011, HKI Resource Specialist Kris Carstens called Jacqueline Arroyo, Program Manager with Opportunity Health Services, and arranged services  as HKI Diversion Director, Hilary Shaughnessy, had  advised that HKI  could pay for three weeks of home health care services in order to allow the child to go back home.

_____

52.     On April 11, 2011, CMS Nurse Julie Emerson advised HKI Resource Specialist Kris Carstens to stop all attempts to obtain nursing care for M.A.F.  She elaborated on the barriers to the child remaining in the mothers care, including:

> Julie Emerson, RS with CMS returned phone call.  She stated that Medicaid will not authorize 24 hour coverage.  Julie explained that Medicaid has not authorized 24 hour coverage for many years.  She stated that Medicaid just does not have the budget to do so.  Julie reported that M.A.F. does not meet the medical criteria for a skilled nurse.  M.A.F. is only authorized (through Medicaid) for a home health aide which limits the providers available to offer services.  In addition, the Med Waiver will no longer be available to families…which means that M.A.F. would lose the current respite hours that were being paid through the Med Waiver account (16 hours per week according to the mother, Doris).   Julie explained that a home health care agency applies for Medicaid payment on behalf of the family,  She stated that the length of time it takes to proves an application for home health care payment depends on how knowledgeable the agency us with working with ACA and KeyPro system.  It can take anywhere from 2 weeks to several months to get Medicaid to approve payments for services.  Julie stated that Medicaid will not pay for 24 hour coverage; therefore, it is not a good idea for HKI to pay for a period of time because at the end of the three weeks there will be no available home health care services and Doris cannot care for this child due to her physical disabilities and lack of support.  Julie advised that the CPI needs someone to explain to the court how the system works, she can call CMS; main phone number at (813) 39609743 and ask for the on call nursing supervisor.

53.     The assertion that Medicaid will not authorize 24 hour coverage, and has not done so for many years, was knowingly false.  At such time, Medicaid had provided over one thousand children in Florida 24 hour coverage.  Due to the knowledge and experience of HKI in establishing foster care for children with disabilities, it was similarly known that such assertion was false.

_____

54.     Because of such wrongful assertions regarding the supposed impossibility of receiving Medicaid benefits to cover the seven hours needed by Freyre to bring M.A.F. home, no member of the Child Protective Team made any to obtain additional hours from KeyPro and/or the Agency for Persons with Disabilities (APD), and simply discounted the assertions of Opportunity Health Services to provide health care services for M.A.F.

55.     Further, CMS Nurse Julie Emerson stated that M.A.F. does not qualify for medical foster care or APD group home services. As of April 13, 2011, HCSO and HKI were in agreement that there was not to be reunification with Freyre and M.A.F.

56.     Rather than making any attempts to comply with the Court Order and providing M.A.F. with services at home, the Defendants began their attempt to find institutionalized care for M.A.F.

57.     As a result of this determination to institutionalize M.A.F., the Office of the Attorney general through attorney Angeline Attila filed a dependency petition based solely on the disability of Freyre and her inability to care for M.A.F.  At the status hearing of April 14, 2011, Ms. Attila made the following misrepresentations to a different judge of the Thirteenth Judicial Circuit:

> MS. ATTILA: Your Honor, we're here for an arraignment (slash) status. The child is 14 years old and has cerebral palsy. She's currently at a CMS nursing home. We sheltered the child on March 30th of 2011. The shelter judge at that time, wanted us to look into possibly returning the child to the mother, by helping her with additional services, and if that could not be done, to place her in foster care placement and move forward with the dependency process. We looked into several services to try to put the child back home with the mother.
> …

_____

The nursing aid individuals, as well as the hospital has expressed some concern that mother may not be able at this point in time, to meet the child's needs because of the severity of her illness. We looked into the nursing aids. We contacted them. We asked them, is there anything else we can do? Can we get a day nurse and a night nurse.

MS. ATTILA: They said it would have to be approved by Medicaid. We contacted Medicaid and we stated we need these services for 24 hours assistance. Medicaid said, no, we will not pay for *24-hour* assistance. Currently the mother is receiving all that we can pay for. There's no additional payments out there or additional funds out there that we can provide for the mother that would provide her with that additional eight -- four to eight hours of assistance that she needs. So Medicaid said no, therefore we could not get an additional aid in the home to assist the mother, since she cannot care for the child for 24 hours. The home aid health services that was working with the mother said we will no longer work with the mother, because we grave concerns therefore, we no longer be working with the mother.  We attempted to look for another health aid service, but the problem is, we can't -- Medicaid won't pay for the additional -- for an additional four to eight hours of services and there's no additional funding that we could put in place to guarantee that.

So because of all these issues, Your Honor, the best placement for the child right now, is a CMS nursing home where she can get that *24* hour supervision and care that she needs, and because of the mother's concern. Mother's back issues and medical issues, <u>there is really nothing more that HC can do to ensure the safety and well-being of the child in the home.</u>

58.     These "factual statements" wrongfully and intentionally made by Defendant Attila to the Court were misrepresentations.

      a.     The shelter judge never at any time suggested foster care placement or the  dependency process, and,

      b.     The Defendants never attempted to contact Medicaid.

_____

59.     Counsel for Freyre questioned the veracity of the state's statements, and the court ordered that for there to be any change or modification of placement, the court would need to receive evidence at a modification hearing, appointed a guardian ad-litem, and set the matter for trial the week of June 20, 2011.

60.     On April 15, 2011, Tampa General Hospital began to place pressure on HKI and CPI to move M.A.F.  The social worker from TGH, Rosana Rivera, stated that the M.A.F. is ready to be released from the hospital and the only reason she is there is because she has no placement. She stated that the child was treated for a urinary tract infection and it is unsafe for the child to be there because she is going to get all types of germs being there. She stated that Tampa General is not being paid for the child being there and the child has been there for 17 days. As a result, Ms. Rivera appeared very upset as she contacted numerous people regarding the placement for the M.A.F.

61.     As HKI did not have experience in placing children in geriatric nursing homes, the case manager requested assistance in finding a nursing home from Ms. Rivera.  As of April 19, 2011, M.A.F. was approved for the extensive additional funding for placing M.A.F. in a geriatric nursing home.

62.     Until Friday, April 22, Rosana Rivera and HKI attempted to find a geriatric nursing home to accept M.A.F.  Initially, a geriatric nursing facility in Tampa, Lakeshore Villas, stated that they may be willing to take M.A.F.  However, when they discovered that M.A.F. was not medically fragile (dependent on 24 hour per day mechanical assistance) they refused to admit M.A.F.  As a result, of the six geriatric nursing homes that take pediatric patients, only Florida

_____

Club Care, in Miami-Dade County agreed to take a patient that did not require a skilled level of care, such as M.A.F.

63.     Jill Adams, the Supervising Attorney with the office of the Florida Attorney General, contacted Angeline Attila, and stated "I cannot find any notes/order stating the child cannot be moved however did see the mother is allowed unsupervised visits.  I am doing my best to see if the facility will keep the spot open until Tuesday so that you can have a court hearing or address the case appropriately."

64.     Jill Adams, the Supervising Attorney with the office of the Florida Attorney General, then contacted OAG Tiffany Short, as Angeline Attila was not going to be in the office on Monday and advised Ms. Short, as follows:

> Angeline appears to be out on Monday so I wanted to bring this to your attention. The facility has agreed to hold the spot open until Tuesday.  Iris is going to contact the mother to tell her that the only possible placement is across the state and to contact her attorney if she has a problem, As I stated in my previous email I do not see anything legally keeping us from moving the child, however, since you know your Judge better, I didn't know if we needed to attempt to get an emergency hearing.  Please follow up with Iris and Jessica on Monday so they can either appear at the hearing or make arrangements to move the child.

65.     When Freyre was advised of the transfer from Tampa General Hospital to Florida Club Care in Miami, she was very upset.  At that time, Freyre advised the social worker and HKI and CPI employees that such attempts were in direct contravention to the Shelter order by Judge Vivian T. Corvo issued on March 30, 2011.  Freyre  indicated that if her child were moved to Miami, she would have no way to go see her daughter.  She advised that family wanted a hearing in front of the court on Monday prior to the transfer.

66.     Freyre was advised that the move was going to be postponed until Tuesday, so it could be addressed further at a hearing by obtaining dependency court approval for this transfer.

_____

67.     OAG Jill Adams was made aware of Freyre's desire for a hearing.

68.     On Monday, April 25, 2011, Freyre filed a "Petition requesting urgent emergency hearing" to prevent the transfer of her daughter.

69.     On Monday, April 25, 2011, OAG Angeline Attila filed a motion for M.A.F. to be administered psychotropic drugs because of denial of consent of Freyre.  However, on April 25, she discovered that the motion was not going to be heard until May 9th, as the week of the 25th was a trial week for the Judge Peacock, and no motions were to be heard.  As such, the CPI was advised by OAG Tiffany Short that they did not have to have a hearing to have the child transported to Miami, and asserted to CPI that there were no motions filed to stop the move.

70.     On April 22, 2011, in providing transfer orders, Dr. Karolina Dembinski of Tampa General Hospital stated that delaying M.A.F.'s medications would result in a high likelihood of intractable seizures which may possibly result in the death of M.A.F.

71.     Prior to discharge, Creshanda Riley from HKI came to visit with Freyre and M.A.F. and brought along another person whom is actually going to transport pt's wheelchair to Miami.

72.     HKI counselor Creshanda Riley was talking to mom and providing support and copies of paperwork mom was demanding (copy of the consent to transfer, the court order, and a list of the SNFs in the state). Freyre was upset and was not in agreement with the plan in place. CPI PIETRZAK refused to allow Freyre to accompany M.A.F. in the ambulance to the geriatric nursing facility in Miami which was not going to provide M. A. F. with her scheduled anti-seizure medications, food, and water to keep her alive for that five hour transport.

_____

73.     Freyre requested that she be allowed to accompany her daughter on the approximately five hour trip to ensure that Marie's needs were being met, including, but not limited to nutrition, hydration, medications  and emotional support, all of which she would have been able to provide during the transport. CPI PIETRZAK's refusal to allow Freyre to go on that ambulance transport with her daughter directly violated Freyre's unlimited visitation rights with her daughter. It also violated the duty to first obtain court approval before intentionally failing to administer M.A.F.'s required anti-seizure medications.

74.     Even though CPI PIETRZAK was aware that medications would need to be administered in transport, she did not review prior to transport, or ensure on the day of transport, that the ambulance company was going to administer the required medications, food, and water…and she was on direct notice on the day of transport that they would not do so.

75.     As a result of the lack of care and treatment during the transport and upon arrival at Florida Club Care, and the wrongful separation of her mother who was her main medical and emotional caregiver, M.A.F. was hysterical throughout the transport, became dehydrated, and was not administered her medications.  M.A.F. died soon after arrival at Florida Club Care.

76.     For years, Florida officials, including the defendants, have been aware of the pervasive, systemic practices in the State of Florida and Hillsborough County that have led to the institutionalization of children with disabilities and removal of such children from such parents because of the parent's physical, learning, or emotional inability to care for their children without assistance.  This pervasive, systemic problem includes the following:

_____

a.  The failure to provide adequate home health or nursing care to parents with children with disabilities and then requiring such children to be removed from their parents or legal guardians;

b.  The failure to develop and provide medical foster homes to prevent such children from being institutionalized and limiting opportunities for reunification and community based care.

## COUNT I

### Title II of the Americans with Disabilities Act
### (NEXTGEN ALLIANCE, INC., HILLSBOROUGH COUNTY SHERIFF'S OFFICE AND STATE OF FLORIDA)

77.     The Plaintiffs repeat the allegations in paragraphs one through 76 of the Complaint as if fully set forth herein.

78.     Plaintiffs is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the ADA.

79.     The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

80.     Further, the regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

81.     Public entities "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully

_____

and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

82.     As public entities and instrumentalities of the state, Defendants are prohibited from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 CFR 35.130(b)(1)(iii)

83.     Defendants have discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

84.     Defendants have purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community.

85.     The Defendants have discriminated against the Plaintiff in violation of the ADA on the basis of their disabilities by:

a.     Segregating M.A.F. and failing to provide her with appropriate community based services;

b.     Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

c.     Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

_____

86.     As a result of the Defendants' violations, the Plaintiff was damaged by the forced

separation between her and her daughter and her daughter's subsequent death.

87.     Such actions of the Defendants were willful or in reckless disregard to the protected

rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of

FREYRE against STATE OF FLORIDA, NEXTGEN ALLIANCE, INC., and

HILLSBOROUGH COUNTY SHERIFF'S OFFICE for all recoverable compensatory damages,

attorney's fees and costs, and all such other lawful damages and relief as the Court may deem

appropriate and proper.

## COUNT II
### Section 504 of the Rehabilitation Act
### (STATE OF FLORIDA, NEXTGEN ALLIANCE, INC., HILLSBOROUGH COUNTY SHERIFF'S OFFICE)

88.     The Plaintiffs repeat the allegations in paragraphs 1 through 76 of the Complaint as if

fully set forth herein.

89.     Count II is a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §.

794(a).

90.     Plaintiffs is both a qualified individual with a disability, and associated with a person

with a disability within the meaning of the Rehabilitation Act.

91.     Defendants STATE OF FLORIDA, HILLSBOROUGH KIDS, INC., and

HILLSBOROUGH COUNTY SHERIFF'S OFFICE are all recipients of federal financial

assistance.

_____

92.   Defendants have discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

93.   Defendants have purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community.

94.   The Defendants have discriminated against the Plaintiff in violation of the ADA on the basis of their disabilities by:

   d.   Segregating M.A.F. and failing to provide her with appropriate community based services;

   e.   Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

   f.   Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

95.   As a result of the Defendants' violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

96.   Such actions of the Defendants were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against STATE OF FLORIDA, NEXTGEN ALLIANCE, INC., and HILLSBOROUGH COUNTY SHERIFF'S OFFICE for all recoverable compensatory damages,

_____

attorney's fees and costs, and all such other lawful damages and relief as the Court may deem

appropriate and proper.

## COUNT III

**42 U.S.C. § 1985 – CONSPIRACY TO DENY CIVIL RIGHTS BY IRIS C. VALDEZ; JESSICA PIETRZAK, JULIE EMERSON; ALEXIS ARGERIOUS, ANGELINE ATTILA, JILL ADAMS, TIFFANY SHORT, AND CRESHANDA RILEY**

97.    The Plaintiffs repeat the allegations in paragraphs 1 through 76 of the Complaint as if

fully set forth herein.

98.     This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the

deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth

Amendment of the United States Constitution and applicable federal laws applicable

federal laws, including without limitation, the Adoptions and Safe Families Act.

99.     At all times relevant hereto, VALDEZ and PIETRAK, as the Child Protective

Investigators with the Hillsborough County Sheriff's Office, were acting under color of

state law and were acting or purporting to act in the performance of their official duties.

100.    At all times relevant hereto, EMERSON, as a nurse employed by Children's Medical

Services (CMS), a Division of the Florida Department of Health, an executive agency of

the State of Florida, was acting under color of state law and was acting or purporting to

act in the performance of her official duties.

101.    At all times relevant hereto, ALEXIS ARGERIOUS, ANGELINE ATTILA, JILL

ADAMS, TIFFANY SHORT, an attorney employed by Children's Legal Services, a

division of the State of Florida Department of Children and Families, were acting under

_____

color of state law and were acting or purporting to act in the performance of their official

duties

102.   At all times relevant hereto, CRESHANDA RILEY, was a case manager assigned to

M.A.F. with Defendant Hillsborough Kids, Inc., was acting under color of state law and

was acting or purporting to act in the performance of her official duties.

103.   At all relevant times, it was clearly established that children in the physical custody of the

state foster care system had the Constitutional and federal right to be safe and free from

unreasonable risk of harm.

104.   Further, it is one of the most time-honored Constitutional rights for parents to have the

ability to raise their own children how they see fit.

105.   Federal law requires that reasonable efforts shall be made to preserve and reunify

families (i) prior to the placement of a child in foster care, to prevent or eliminate the

need for removing the child from the child's home; and (ii) to make it possible for a child

to safely return to the child's home.

106.   Each of these individual Defendants, jointly and severally, entered into a conspiracy to

deny FREYRE her rights as a parent of a child with a severe disability solely because of

her own disability and failed to perform any reasonable efforts to preserve or reunify

M.A.F. with her mother solely due to her disability.

107.   At all times material hereto, VALDEZ, PIETRAK, EMERSON,   ARGERIOUS,

ATTILA, ADAMS, SHORT and RILEY were deliberately indifferent and/or acted with

reckless disregard to M.A.F. health, safety, and welfare and FREYRE's Constitutional

and federal rights, as follows:

_____

a.  By failing to comply with lawful court orders to request home health aide services to be provided in the home from midnight to 7:00 A.M.,

b.  By failing to provide home health aide services in the home from midnight to 7:00 A.M. despite availability of funding;

c.  By deliberately making misrepresentation to the presiding court of any efforts to provide assistance for unification of M.A.F. to FREYRE and thus denying due process;

d.  By transferring M.A.F. to a institutional placement five hours away from her mother, without any lawful authority and contrary to the pleading of FREYRE;

e.  By denying FREYRE any legal remedy or process to prevent the transfer to the remote institutional placement;

f.  By failing to provide M.A.F. the necessary care, medication and treatment necessary for a safe transfer to the remote institutionalization;

g.  By deliberately preventing FREYRE to travel with her daughter M.A.F. and allowing her to ensure proper care and treatment for M.A.F. during her transfer;

h.  Thus causing the death of M.A.F. soon after her transfer due to the lack of necessary care and treatment while in state custody.

108.   VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and RILEY enforced a policy and practice of denying persons with Disabilities to have custody

_____

of their child when they are physically unable to care for their children without available aids and supports.

109.     VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and RILEY took said actions knowing FREYRE would be denied lawful custody of her daughter and M.A.F. would be at a substantial risk of serious harm.

110.     Despite having the authority and means to remedy the unconstitutional treatment of FREYRE, VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and RILEY were deliberately indifferent and/or recklessly failed to take immediate action to ensure that FREYRE was able to be reunified with her daughter.

111.     VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and RILEY deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including FREYRE suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

112.     The actions of VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and RILEY constitute a pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected rights and liberty and privacy interests of Plaintiffs herein.  As  a result, Plaintiff has been deprived of the substantive due process rights.

113.     The substantive due process rights include, but are not limited to: the right not to be subject to loss of life and liberty as a result of deliberate misrepresentations to a court of law, the right to not be separated from one's child without due process, the right to protection from

_____

unnecessary harm while in government custody, the right to a living environment that protects a child in custody physical, mental and emotional safety and well being, the right to services necessary to prevent a child in custody from deteriorating or being harmed physically, psychologically, or otherwise in governmental custody, including, but not limited to the right to safe and secure foster care placements, and appropriate planning and services directed towards reestablishment of the family unit

114. FREYRE is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and RILEY for all recoverable compensatory and punitive damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IV
## 42 U.S.C. §1983 CLAIM AGAINST NEXTGEN ALLIANCE, INC.

115. The Plaintiffs repeat the allegations in paragraphs 1 through 76 of the Complaint as if fully set forth herein

116. This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Freyre's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws. applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

_____

117.    At all times relevant hereto, HKI was a "person" and was acting under color of state law within the meaning of 42 U.S.C. §1983.

118.    At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

119.    Pursuant to § 409.1671, Florida Statutes, DCF delegated responsibility for providing foster care and related services to lead agencies, which are defined both in the statute and the contract with DCF as the not-for-profit community-based care agency responsible for coordinating, integrating and managing a local system of supports and services for children.

120.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

121.    At all relevant times, it was clearly established that reasonable efforts are required to be made to preserve and reunify families (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home.

122.    Although § 409.1671 grants lead agencies such as HKI the authority to enter into subcontracts for specific services, it cannot and does not permit HKI to delegate their Constitutional and statutory duties to ensure the safety and well-being of each child in its care.

123.    As such, and at all relevant time hereto, HKI had a constitutional, statutory, and a non-delegable duty to ensure the health, welfare, and safety of each child in its custody and

_____

parents have a constitutionally protected liberty interest in the care, custody and management of their children.

124.     HKI has a practice to deny rights to a parent of a child when such parent has disability solely because of that parent's own disability and as such, HKI failed to perform any reasonable efforts to preserve or reunify M.A.F. with her mother solely due M.A.F.'s mother's disability.

125.     HKI violated Freyre's Constitutional rights as follows:

      i.     HKI represented to the Court that it would provide necessary services to FREYRE and M.A.F. to be able to be reunited with FREYRE and to ensure M.A.F.'s continuity of care and continued receipt of necessary care and services;

     ii.     HKI facilitated the transfer of M.A.F. to a remote institution without lawful authority and contrary to the wishes of the parent of the child.

   iii.     HKI established and enforced customs, policies, and/or practices which resulted in supervisors regularly failing to conduct supervisory reviews or when such reviews were conducted, failing to actually provide guidance and direction to the case managers, such as occurred in this case;

   iv.     HKI established and enforced customs, policies, and/or practices which resulted case managers regularly failing to ensure that parents with disabilities can be reunified with their children and receive necessary services to ensure reunification.

_____

126.    HKI took said actions knowing it was exposing children who were in State custody, including M.A.F. and FREYRE, to a substantial risk of serious harm.

127.    Despite possessing the authority and means to remedy the unconstitutional treatment of FREYRE and M.A.F., HKI  was deliberately indifferent and/or recklessly failed to take immediate action to ensure that M.A.F. and all children like her received all necessary treatment and services and were not harmed while in State custody as well as preserving a parents right to reunification.

128.    HKI's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the separation of  FREYRE from M.A.F., and M.A.F.'s institutionalization, including FREYRE's suffering psychological harm and trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against HKI and for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper

## COUNT V

## 42 U.S.C. §1983 CLAIM AGAINST HILLSBOROUGH COUNTY SHERIFF'S OFFICE

129.    The Plaintiffs repeat the allegations in paragraphs 1 through 76 of the Complaint as if fully set forth herein

130.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Freyre's guaranteed rights under the Fourteenth

_____

Amendment of the United States Constitution and applicable federal laws. applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

131.   At all times relevant hereto, HCSO was a "person" and was acting under color of state law within the meaning of 42 U.S.C. §1983.

132.   At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

133.    Pursuant to § 409.1671, Florida Statutes, DCF delegated responsibility for providing foster care and related services to lead agencies, which are defined both in the statute and the contract with DCF as the not-for-profit community-based care agency responsible for coordinating, integrating and managing a local system of supports and services for children.

134.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

135.   Although § 409.1671 grants lead agencies such as HCSO the authority to enter into subcontracts for specific services, it cannot and does not permit HCSO to delegate their Constitutional and statutory duties to ensure the safety and well-being of each child in its care.

136.   As such, and at all relevant time hereto, HCSO had a constitutional, statutory, and a non-delegable duty to ensure the health, welfare, and safety of each child in its custody and the knowledge that  parents have a constitutionally protected liberty interest in the care, custody and management of their children.

_____

137.    Further, it is one of the most time-honored Constitutional rights for parents to have the ability to raise their own children how they see fit.

138.    At all relevant times, it was clearly established that reasonable efforts are required to be made to preserve and reunify families (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home.

139.    Despite clearly established rights, Defendant HCSO had a practice to deny of denying persons with Disabilities to have custody of their child when they are physically unable to care for their children without available aids and supports and as such, failed to take any reasonable efforts to preserve or reunify M.A.F. with her mother.

140.    At all times material hereto, with full knowledge and approval of their acts, and pursuant to HSCO practice and policy, CPI VALDEZ and PIETRAK, were deliberately indifferent and/or acted with reckless disregard to M.A.F. health, safety, and welfare and FREYRE's Constitutional and federal rights, as follows:

   a.   By transferring M.A.F. to an institutional placement five hours away from her mother, without any lawful authority and contrary to the pleading of FREYRE;

   b.   By denying FREYRE any legal remedy or process to prevent the transfer to the remote institutional placement;

   c.   By failing to provide M.A.F. the necessary care, medication and treatment necessary for a safe transfer to the remote institutionalization;

_____

d.   By deliberately preventing FREYRE to travel with her daughter M.A.F. and

allowing her to ensure proper care and treatment for M.A.F. during her

transfer;

e.   Thus causing the death of M.A.F. soon after her transfer due to the lack of

necessary care and treatment while in state custody.

141.   CPI PIETRAK enforced a policy and practice of denying persons with

Disabilities to have custody of their child when they are physically unable to care for their

children without available aids and supports.

142.   CPI VALDEZ, and PIETRAK, took said actions knowing FREYRE would be

denied lawful custody of her daughter and M.A.F. would be at a substantial risk of serious harm.

143.   HCSO deliberate indifference and/or recklessness was a substantial factor, and a

direct and proximate cause of the allegations and harm set forth above including FREYRE

suffering physical harm, medical harm, psychological harm and trauma, pain and suffering,

deterioration, and other reasonably foreseeable damages.

144.   HCSO established and enforced customs, policies, and/or practices which resulted

case managers regularly failing to ensure that parents with disabilities can be reunified with their

children and receive necessary services to ensure reunification.

145.   HCSO took said actions knowing it was exposing children who were in State

custody, including M.A.F. and FREYRE, to a substantial risk of serious harm.

146.   Despite possessing the authority and means to remedy the unconstitutional

treatment of FREYRE and M.A.F., HCSO  was deliberately indifferent and/or recklessly failed

to take immediate action to ensure that M.A.F. and all children like her received all necessary

_____

treatment and services and were not harmed while in State custody as well as preserving a

parents right to reunification.

147.    HKI's deliberate indifference and/or recklessness was a substantial factor, and a

direct and proximate cause of the separation of  FREYRE from M.A.F., and M.A.F.'s

institutionalization, and death, including FREYRE's suffering psychological harm and trauma,

pain and suffering, deterioration, and other reasonably foreseeable damages.


WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in

favor of FREYRE against HCSO and for all recoverable damages, attorney's fees and costs, and

all such other lawful damages and relief as the Court may deem appropriate and proper.



Dated this 8th day of November, 2013.


                              LAW OFFICES OF MATTHEW W. DIETZ, P.L.
                              2990 Southwest 35th Avenue
                              Miami, Florida 33133
                              Phone (305) 669-2822
                              Facsimile (305) 442-4181
                              E-Mail: Matthewdietz@usdisabilitylaw.com


                              BY:    s/ Matthew W. Dietz
                                     MATTHEW W. DIETZ, ESQUIRE
                                     FL. BAR NO.: 0084905