**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No.: 8:13-cv-02873**


DORIS FREYRE,

      Plaintiffs,

v.


SHERIFF DAVID GEE as Sheriff of the
Hillsborough County Sherriff's Office,
HILLSBOROUGH COUNTY SHERIFF'S
OFFICE; NEXTGEN ALLIANCE, INC.;
STATE OF FLORIDA, IRIS C. VALDEZ;
JESSICA PIETRZAK, JULIE EMERSON;
ALEXIS ARGERIOUS, ANGELINE
ATTILA, JILL ADAMS, and TIFFANY
SHORT.

      Defendants.

_____/


**SECOND AMENDED COMPLAINT**

Plaintiff, DORIS FREYRE, by and through undersigned counsel, sues the Defendants,

SHERIFF DAVID GEE as Sheriff of the Hillsborough County Sheriff's Office,

HILLSBOROUGH COUNTY SHERIFF'S OFFICE NEXTGEN ALLIANCE, INC., STATE OF

FLORIDA, IRIS C. VALDEZ, JESSICA PIETRZAK, JULIE EMERSON, ALEXIS

ARGERIOUS, ANGELINE ATTILA, JILL ADAMS, and TIFFANY SHORT, and allege as

follows:

1.     The Supreme Court of the United States has long held that parents have a

Constitutionally protected liberty interest in the care, custody and management of their children.

_____

Indeed, a mother's interest in the care, custody and control of her child is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court. This matter involves state actors removing and institutionalizing a child with a disability from her mother, solely because of her mother's disability and without due process as required by law. Such removal and institutionalization directly led to the death of the child with a disability.

2.      This Court has original jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Federal Civil Rights Act, 42 U.S.C § 1983, for violations of the Fourth and Fourteenth Amendments to the United States Constitution. In this action, Plaintiff was injured and now seek damages.

3.      At all times material hereto, Defendant, SHERIFF DAVID GEE ("GEE") is the Sheriff of the Hillsborough County Sheriff's Office located in Hillsborough County, Florida and is otherwise *sui juris* as Sheriff of the Hillsborough Sheriff's Office.

4.      HILLSBOROUGH COUNTY SHERIFF'S OFFICE is a public entity pursuant to 42 U.S.C. § 12131, and is subject to the provisions of Title II of the Americans with Disabilities Act.

5.      HILLSBOROUGH COUNTY SHERIFF'S OFFICE is a recipient of federal financial assistance, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

6.      At all times material hereto, HILLSBOROUGH COUNTY SHERIFF'S OFFICE was the lead agency for the investigation of dependency actions and provider of protective services

in Hillsborough County, Florida, pursuant to § 409.1671, Florida Statutes, and operated under a contract with the State of Florida Department of Children and Families (DCF) to provide such services to children in Hillsborough County.

7.      Defendant, STATE OF FLORIDA is a public entity pursuant to 42 U.S.C. § 12131, and is subject to the provisions of Title II of the Americans with Disabilities Act.

8.      Defendant STATE OF FLORIDA is a recipient of federal financial assistance, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

9.      Defendant, JESSICA PIETRZAK, was the Child Protective Investigator, (hereinafter referred to as CPI PIETRZAK), and she was employed with the Hillsborough County Sheriff's Office (HCSO), GEE maintained a supervisory role of all actions undertaken by CPI PIETRZAK during the course and scope of her employment, and she was at all times *sui juris*.

10.     Defendant IRIS C. VALDEZ, was the Child Protective Investigator Supervisor (hereinafter referred to as CPI VALDEZ), and she was employed with the Hillsborough County Sheriff's Office (HCSO), GEE maintained a supervisory role of all actions undertaken by CPI VALDEZ during the course and scope of her employment, and she was at all times *sui juris*.

11.     Defendant, IRIS C. VALDEZ (hereinafter "VALDEZ"), was a Child Protective Investigator ("CPI") employed by HCSO, who, at times relevant hereto, investigated allegations that M.F. was being abused and/or neglected by FREYRE, and was obligated to ensure the safety and lawful placement of M.A.F.

12.     At all times relevant hereto, VALDEZ was obligated to comply with all State and

_____

Federal laws and regulations as well as departmental/district procedures regarding children in state care.

13.    Defendant, JESSICA PIETRZAK (hereinafter "PIETRZAK"), was a Child Protective Investigator ("CPI") employed by HCSO, who, at times relevant hereto, investigated allegations that M.F. was being abused and/or neglected by FREYRE, and was obligated to ensure the safety and lawful placement of M.A.F.

14.    At all times relevant hereto, PIETRZAK was obligated to comply with all state and federal laws and regulations as well as departmental/district procedures regarding children in state care.

15.    Under state law, DCF contracts with private community based agencies and gives them the power to provide foster care and protective services to children in state custody. Under the current system, these agencies are integral to DCF's ability to carry out its public function and objectives.

16.    Defendant NEXTGEN ALLIANCE, INC. is a corporation organized and existing under the laws of Florida and operates its business primarily in Hillsborough County, Florida.

17.    Defendant NEXTGEN ALLIANCE, INC. changed their name from HILLSBOROUGH KIDS, INC. on July 26, 2013 and is therefore referred to as "HILLSBOROUGH KIDS, INC." or "HKI" in this complaint.

18.    Defendant HILLSBOROUGH KIDS, INC. is a recipient of federal financial assistance, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

19.     At all times material hereto, HILLSBOROUGH KIDS, INC was the lead agency for coordination and delivery of community-based foster care and related services in Hillsborough County, Florida, pursuant to § 409.1671, Florida Statutes, and operated under a contract with DCF to provide such services to children in the custody of DCF.

20.     At all times material hereto, Defendant, HILLSBOROUGH KIDS, INC. was a corporation organized and existing under the laws of Florida and operates its business primarily in Hillsborough County, Florida. HILLSBOROUGH KIDS, INC. was obligated to provide case management services to children in foster care and under protective supervision in Hillsborough County, including M.A.F., and had ultimate responsibility to ensure that the needs of all foster children including the M.A.F.'s needs were met by establishing and using the means necessary to confirm and ensure that it did, in fact, meet M.A.F.'s needs.

21.     Defendant, JULIE EMERSON, (NURSE EMERSON) was a nurse employed by Children's Medical Services (CMS), a Division of the Florida Department of Health, an executive agency of the STATE OF FLORIDA, and is otherwise *sui juris*

22.     Defendant, ALEXIS ARGERIOUS, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

23.     Defendant, ANGELINE ATTILA, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

_____

24.     Defendant JILL ADAMS, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

25.     Defendant TIFFANY SHORT, was, at all times material, an attorney employed by Children's Legal Services, a division of the STATE OF FLORIDA Department of Children and Families, and is otherwise *sui juris*.

26.     At all times relevant hereto, IRIS C. VALDEZ, JESSICA PIETRZAK, JULIE EMERSON, ALEXIS ARGERIOUS, ANGELINE ATTILA, JILL ADAMS, TIFFANY SHORT, and HKI all had the ability, authority and the means to comply with all lawful orders and the requirement of statutes and the United States Constitution.  Each is being sued in her individual capacity.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because (a) the Defendants are in this judicial district, and (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring within this judicial district.

28.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable of right by jury.

29.     Plaintiff retained the Disability Independence Group, Inc. and has agreed to pay them a reasonable fee for their services.

## FACTS

30.     DORIS FREYRE ("Freyre") is a resident of Hillsborough County, Florida, and is *sui juris*.

_____

31.     Freyre is a person with a disability as defined by the Americans with Disabilities Act, 42 U.S.C. 12102.  Freyre is disabled due to a back injury and is classified as disabled by the Social Security Administration. Freyre has six herniated disks in her back from a car accident, cannot lift more than ten pounds, and suffers from carpel tunnel syndrome.

32.     From M.A.F.'s birth on October 30, 1996, until her death on April 27, 2011, Freyre was the mother of M.A.F.

33.     M.A.F. lived with severe mental and physical disabilities, including cerebral palsy, congenital hydrocephalus, congenital bi-lateral hip dislocations, seizures and developmental delay. M.A.F. was non-verbal and required assistance with all daily living tasks. She could not feed herself, walk, or reposition herself. M.A.F. used a wheelchair or remained in bed 24 hours a day and required total lifting. M.A.F. had a shunt in place to provide fluid drainage from the brain.

34.     When M.A.F. died, she was in seventh grade and was receiving education through the home-bound educational program through the Hillsborough County School System; however, her intellectual ability was that of a three year old child.

35.     M.A.F. was unable to communicate verbally and used other means to communicate. She enjoyed watching television, especially Spanish programming. She also enjoyed Spanish music. She seemed to understand Spanish and English verbal communication. Her eyes followed movements around her and she smiled and laughs when others address her or when watching children.

36.     For the fourteen years of M.A.F.'s life, Freyre was M.A.F.'s sole parent and caregiver, and had cared for M.A.F. with additional supports and caregivers provided by virtue of Home-Based Community-Based (HBCB) Medicaid Waiver, and other Medicaid services in her

_____

home.  Such services also included home health services, home-bound school, and physical and speech therapy.

37.     Until March 29, 2011, Freyre received home health care assistance in the home seven days a week, but did not have assistance in her home from midnight to 7:00 AM.

38.     Additionally, Freyre had a hoyer lift to assist her in lifting M.A.F. when she did not have a home heath aid assisting her during the hours between midnight and 7:00 AM.

39.     On March 16, 2011, the Hillsborough County Sheriff's Office received a "false" report that Freyre, was not providing appropriate medical care for her child, M.A.F.   M.A.F.'s home health care employee, working for Maxim Home Healthcare, reported to HCSO, among other falsities, that FREYRE was reluctant to take her daughter to the hospital when she had a fever and was in pain.

40.     The HCSO's Investigative Summary, Dated 3/16/2011, lists CPI PIETRZAK as the Protective Investigator and CPI VALDEZ as the Protective Investigator Supervisor. In this summary it specifically states that "The mother does not have any conditions that would affect her in adequately caring for the child. The mother appears to be able to meet the basic needs for the child. The mother suffers from a bad back and is not supposed to be lifting the child, however, she continues to do this for her daughter and to properly care for the child."

41.     Prior to this investigation, HSCO's has demonstrated an animus against people with disabilities with regards to their "inability" to care for children. In 2003, a HSCO investigation indicated that M.A.F.'s grandmother could not care for M.A.F. because she has a mobility disability, M.A.F.'s grandfather could not care for M.A.F. because he "is disabled and ambulates

slowly," and that M.A.F.'s uncle could not care for M.A.F. because he had an intellectual disability.

42.    Despite finding that Freyre was adequately caring for M.A.F., CPI PIETRZAK began to work with multiple other people, including CPI VALDEZ, NURSE EMERSON, ARGERIOUS, ATTILA, SHORT, ADAMS, and HKI (collectively "THE TEAM") to create a plan to remove M.A.F. from her home with her mother and place her in an institution, against FREYRE's wishes. Through a series of conversations, THE TEAM succeeded in removing M.A.F. and placing her in a nursing facility against Freyre's wishes.

43.    On March 21, 2011, as part of her investigation, CPI PIETRZAK had a telephone conversation with M.A.F. Care coordination nurse, NURSE EMERSON, and NURSE EMERSON relayed that Freyre "seems to be overwhelmed". She stated that the mother has a limited income which could cause problems of her not wanting to relinquish her rights to the child. She stated that there are concerns that mother is physically unable to care for the child once the home health aid is gone. She stated that there does not appear to be any indication that the family will get 24 hour care, and wrongfully stated that no other family or back up care exists for the child during those early morning hours. She stated that the child needs to have 24 hour care, but that the mother has refused to sign the child voluntarily into a facility that can permanently provide that care.

44.    As a result of this complaint, and based almost solely on the erroneous allegations of M.A.F.'s Home health care aid, on March 28, 2011, a multi-disciplinary staffing was held at Child Protection Team (CPT), attended by Maxim Clinical Supervisor Erin Thompson, CPT Child Protection Specialist Laura Dill, Children's Medical Services (CMS) Nurse Julie Emerson, CMS

FHP Joanne White, HCSO CPI Jessica Pietrzak,  HCSO CPI General Manager Heather Grates, and the assistant attorney general, Children's Legal Services, Alexis Argerious.

45.    During the staffing it was learned that the home health care staff and the CMS Nurse had concerns for the safety of M.A.F. They expressed concerns about medical neglect, as well as mental and physical abuse. Due to Freyre's disability, she was unable to lift or provide complete physical care for M.A.F without assistance.  Since she was unable to provide all of M.A.F.'s care without assistance, the Assistant Attorney General (AAG) concurred with probable cause to shelter M.A.F. based on prospective neglect of the child. The decision was made to shelter M.A.F. at Tampa General Hospital on March 29, 2011, until a medical foster home could be secured.

46.    On March 30, 2011, The State of Florida filed a petition in the Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County Florida to place M.A.F. into foster care because of alleged medical neglect.

47.    Freyre has always denied that she neglected or abused M.A.F. She reported she missed medical appointments because she did not want to take M.A.F. out and expose her to germs or inclement weather. She also stated that she was a better judge of M.A.F.'s medical condition and medical needs than others.

48.    Immediately after removing M.A.F. from her mother's care and before any action from the Court, NURSE EMERSON began working to permanently remove M.A.F. from her mother by searching for group homes and even mentioning placing M.A.F. in a facility. NURSE EMERSON began contacting "CMAT staff," medical foster supervisors, and MedWaiver support coordinators in an attempt to find a group home to place M.A.F. NURSE EMERSON also confered

_____

with CPI PIETRZAK and later left her a voicemail about her willingness to find a group home or assist with finding a skilled nursing facility or intermediate care facility for M.A.F.

49.     At the shelter hearing, the Court (Judge Vivian Corvo) found that Freyre should be lauded for caring for her daughter for 14 years, and Ordered that M.A.F. can be returned to the mother without further court order immediately after home health aide services were provided in the home from midnight to 7:00 A.M., but, until such time, Freyre was to receive unlimited visitation of her daughter.

50.     During such hearing, all parties concurred that additional services were to be provided to Freyre, and that Freyre would be reunited with M.A.F. at her home. Judge Corvo stated, "Because this is a very unusual circumstance, and I you know, the child is totally disabled and being cared by her mother for 14 years. Just…we need to fix it."  The following was stated:

> MS. PARSONS with Hillsborough Kids, Inc. (HKI) on behalf of the State of Florida: I spoke with my supervisor, Hillary Shaughnessy (ph), and she said if that was an issue that we can utilize funds in order to hire a home health care agency to work with her for a short period of time; two weeks, three weeks and then work with her to try to get her connected to getting that paid through Medicaid, or something.
>
> THE COURT: Wonderful, wonderful. You just did an outstanding job for us. So can I shelter with the mom, with the department to provide services in the home between midnight and 7 a.m., and then we will we can all reconvene. Any objections to that by anyone? All right, this is what's going to happen. Your daughter is going to go back to the home, but I'm allowing the department to continue to come into your home and observe what's going on.
>
> MS. FREYRE: Okay
>
> THE COURT: They're going to hire somebody, to have someone in that home.

_____

MS. FREYRE: Okay

THE COURT: Actually, I don't want her, I guess, to go the child to
go home until you've hired somebody.

MS. PARSONS: Okay

THE COURT: All right. The child will go home once they have
someone to be there from midnight to 7 a.m. And they're going to
provide services to you. Let me suggest to you that you accept those
services.

MS. FREYRE: Yes

THE COURT: Because if you don't,

MS. FREYRE: I Accept

THE COURT: -- then I'm going to be compelled to remove the child.

51.     Following the Hearing, the HKI Resource Specialist, Kris Carstens, then made
efforts to engage the additional home health care aids to cover the midnight to 7 AM time period.
The Resource Specialist immediately found two local providers and HKI approved the pay request
on April 8, 2011.

52.     On April 1, 2011, Maxim Director Susan Macy reported that **HKI can apply for
24 hour home health care services through Medicaid again and that if she could get a letter
written from the court, Medicaid may agree to pay for the additional hours.**  **No attempts**
were made to obtain a letter from the court to request the additional services.

53.     HKI Resource Specialist, Kris Carstens also ensured that Freyre would have
emergency back-up services in the event that a home health care aid failed to show for a scheduled
shift.

_____

54.     Despite Kris Carstens efforts, HKI failed to retain or pay for additional home health services for M.A.F., and M.A.F. remained at Tampa General Hospital.

55.     On April 11, 2011, HKI Resource Specialist Kris Carstens called Jacqueline Arroyo, Program Manager with Opportunity Health Services, and arranged services  as HKI Diversion Director, Hilary Shaughnessy, had  advised that HKI  could pay for three weeks of home health care services in order to allow the child to go back home.

56.     On April 11, 2011, NURSE EMERSON advised HKI Resource Specialist Kris Carstens to **stop all attempts** to obtain nursing care for M.A.F. as she would not be able to get any additional hours, and she may lose the nursing hours that she currently had though her Medicaid Waiver.  Such direction was in direct violation of the Court's instructions.  She elaborated on the barriers to the child remaining in the mothers care, including:

> Julie Emerson, RS with CMS returned phone call.  She stated that Medicaid will not authorize 24 hour coverage.  Julie explained that Medicaid has not authorized 24 hour coverage for many years.  She stated that Medicaid just does not have the budget to do so.  Julie reported that M.A.F. does not meet the medical criteria for a skilled nurse.  M.A.F. is only authorized (through Medicaid) for a home health aide which limits the providers available to offer services.  In addition, the Med Waiver will no longer be available to families…which means that M.A.F. would lose the current respite hours that were being paid through the Med Waiver account (16 hours per week according to the mother, Doris).  Julie explained that a home health care agency applies for Medicaid payment on behalf of the family,  She stated that the length of time it takes to proves an application for home health care payment depends on how knowledgeable the agency us with working with ACA and KeyPro system.  It can take anywhere from 2 weeks to several months to get Medicaid to approve payments for services.   Julie stated that Medicaid will not pay for 24 hour coverage; therefore, it is not a

good idea for HKI to pay for a period of time because at the end of the three weeks there will be no available home health care services and Doris cannot care for this child due to her physical disabilities and lack of support.  Julie advised that the CPI needs someone to explain to the court how the system works, she can call CMS; main phone number at (813) 39609743 and ask for the on call nursing supervisor.

57.     NURSE EMERSON's assertion that Medicaid will not authorize 24 hour coverage, and has not done so for many years, was knowingly false.  At such time, Medicaid had provided hundreds of children in Florida 24 hour coverage.

58.     Due to the knowledge and experience of HKI in establishing foster care for children with disabilities, it was similarly known that such assertion was false.

59.     Despite the Court's order and based on their agreement that Freyre could not care for her child solely due to her disability, all member of the Child Protective Team agreed that no further attempts were to be made to obtain additional nursing hours from KeyPro and/or the Agency for Persons with Disabilities (APD), and simply discounted the assertions of Opportunity Health Services to provide health care services for M.A.F.  Such agreement was contrary to law and Freyre's rights to be a parent of M.A.F. notwithstanding her disability.

60.     Further, NURSE EMERSON wrongfully stated that M.A.F. does not qualify for medical foster care or APD group home services.

61.     On April 11, 2011, NURSE EMERSON also spoke with CPI PIETRZAK where the two discussed placing M.A.F. in a nursing facility, again in direct contradiction with the Court's instructions and contrary to law and Freyre's rights to be a parent of M.A.F. notwithstanding her disability.

_____

62.     On April 12, 2011, CPI PIETRZAK noted that Freyre was opposed to the actions that were being taken to keep M.A.F. away from her home. Freyre specifically stated that she felt M.A.F.'s life was in danger. Despite this, CPI PIETRZAK and THE TEAM continued to work towards permanently removing M.A.F. from Freyre's care, again in direct contradiction with the Court's instructions and contrary to law and Freyre's rights to be a parent of M.A.F. notwithstanding her disability.

63.     As of April 13, 2011, HCSO employees and HKI were in agreement that there was not to be reunification with Freyre and M.A.F.

64.     Rather than making any attempts to comply with the Court Order and providing M.A.F. with services at home, the Defendants began their attempt to find institutionalized care for M.A.F.

65.     On April 13, 2011, as a result of this determination to institutionalize M.A.F., ATTILA filed a Petition for Adjudication of Dependency to remove M.A.F. from Freyre's care. In the petition ATTILA specifically stated **twice** that because of Freyre's disability Freyre could not care for M.A.F. ATTILA also stated that there were **no services offered** to Freyre despite the instructions of Maxim's Director to have a letter from the Court or the Court's instruction to help Freyre obtain 24 hours of care for M.A.F.

66.     CPI PIETRZAK collaborated with ATTILA on this Petition by filing an Affidavit of Good Faith Filing with the Petition.

67.     The purpose of this petition that ATTILA and CPI PIETRAK collaborated on was to permanently remove M.A.F. from her mother.

_____

68.     At the status hearing of April 14, 2011, ATTILA knowingly made the following

misrepresentations to a different judge of the Thirteenth Judicial Circuit:

> MS. ATTILA: Your Honor, we're here for an arraignment (slash)
> status. The child is 14 years old and has cerebral palsy. She's
> currently at a CMS nursing home. We sheltered the child on March
> 30th of 2011. The shelter judge at that time, wanted us to look into
> possibly returning the child to the mother, by helping her with
> additional services, and if that could not be done, to place her in
> foster care placement and move forward with the dependency
> process. We looked into several services to try to put the child back
> home with the mother.
> …
> The nursing aid individuals, as well as the hospital has expressed
> some concern that mother may not be able at this point in time, to
> meet the child's needs because of the severity of her illness. We
> looked into the nursing aids. We contacted them. We asked them, is
> there anything else we can do? Can we get a day nurse and a night
> nurse.
>
> MS. ATTILA: They said it would have to be approved by Medicaid.
> We contacted Medicaid and we stated we need these services for 24
> hours assistance. Medicaid said, no, we will not pay for *24-hour*
> assistance. Currently the mother is receiving all that we can pay for.
> There's no additional payments out there or additional funds out
> there that we can provide for the mother that would provide her with
> that additional eight -- four to eight hours of assistance that she
> needs. So Medicaid said no, therefore we could not get an additional
> aid in the home to assist the mother, since she cannot care for the
> child for 24 hours. The home aid health services that was working
> with the mother said we will no longer work with the mother,
> because we grave concerns therefore, we no longer be working with
> the mother.  We attempted to look for another health aid service, but
> the problem is, we can't -- Medicaid won't pay for the additional --
> for an additional four to eight hours of services and there's no
> additional funding that we could put in place to guarantee that.
>
> So because of all these issues, Your Honor, the best placement for
> the child right now, is a CMS nursing home where she can get that
> *24* hour supervision and care that she needs, and because of the
> mother's concern. **Mother's back issues and medical issues**, <u>there</u>

_____

is really nothing more that HC can do to ensure the safety and well-being of the child in the home.

(emphasis added).

69.    These "factual statements" wrongfully and intentionally made by ATTILA to the Court were misrepresentations.

    a.    The shelter judge never at any time suggested foster care placement or the  dependency process, and,

    b.    The Defendants never attempted to contact Medicaid.

70.    Counsel for Freyre questioned the veracity of the state's statements, and the court ordered that for there to be any change or modification of placement, the court would need to receive evidence at a modification hearing, appointed a guardian ad-litem, and set the matter for trial the week of June 20, 2011.

71.    On April 15, 2011, Tampa General Hospital began to place pressure on HKI and CPI to move M.A.F.  The social worker from TGH, Rosana Rivera, stated that the M.A.F. is ready to be released from the hospital and the only reason she is there is because she has no placement. She stated that the child was treated for a urinary tract infection and it is unsafe for the child to be there because she is going to get all types of germs being there. She stated that Tampa General is not being paid for the child being there and the child has been there for 17 days. As a result, Ms. Rivera appeared very upset as she contacted numerous people regarding the placement for the M.A.F. There was no medical urgency present to remove M.A.F. from Tampa General Hospital, and any urgency was due to the fact that Tampa General was not being paid for the child's stay.

_____

72.     On April 15, 2011, Creshanda Riley from HKI began sending and receiving emails from multiple individuals regarding approving M.A.F. for a skilled nursing facility and relocating her to a skilled nursing facility.

73.     Freyre was not informed of any plans to place M.A.F. into a skilled nursing facility.

74.     As HKI did not have experience in placing children in geriatric nursing homes, the case manager requested assistance in finding a nursing home from Ms. Rivera.  As of April 19, 2011, M.A.F. was approved for the extensive additional funding for placing M.A.F. in a geriatric nursing home.

75.     Until Friday, April 22, Rosana Rivera and HKI attempted to find a geriatric nursing home to accept M.A.F.  Initially, a geriatric nursing facility in Tampa, Lakeshore Villas, stated that they may be willing to take M.A.F.  However, when they discovered that M.A.F. was not medically fragile (dependent on 24 hour per day mechanical assistance) they refused to admit M.A.F.  As a result, of the six geriatric nursing homes that take pediatric patients, only Florida Club Care, in Miami-Dade County agreed to take a patient that did not require a skilled level of care, such as M.A.F.

76.     Once a geriatric nursing facility that would accept M.A.F. was identified, THE TEAM moved forward with their conspiracy to remove M.A.F. from her mother's care solely due to Freyre's disability by taking the following actions:

    a.  On April 22, 2011, CPI VALDEZ contacted ATTILA but ATTILA was out of the office, so CPI VALDEZ left a message for ADAMS instead.

    b.  Forty minutes later, ADAMS spoke with CPI VALDEZ about moving M.A.F. to a nursing facility five hours away from Freyre in Miami, Florida. ADAMS

told CPI VALDEZ that there was no legal order indicating that M.A.F. could not be moved out of the county, "however knowing the judge's feelings on this case, it would be best to have the judge hear this in on Monday prior to the child being moved."

c.  CPI VALDEZ then coordinated with Rosanna Rivera to hold off on moving M.A.F. until Tuesday so the case could be brought before the Court on Monday.

d.  CPI VALDEZ spoke with ADAMS again approximately an hour later to confirm that M.A.F. would not be moved until Tuesday. ADAMS stated that she would discuss the case with the attorney assigned to the case about the "best avenue" and "addressing the placement."

e.  CPI VALDEZ then spoke with Creshanda Riley from HKI about transporting M.A.F.'s wheelchair to Miami.

f.  CPI VALDEZ then spoke with ADAMS again about the specific facility M.A.F. would be transported to in order to inform Freyre's counsel.

g.  ADAMS, the Supervising Attorney with the office of the Florida Attorney General, contacted ATTILA, and stated "I cannot find any notes/order stating the child cannot be moved however did see the mother is allowed unsupervised visits.  I am doing my best to see if the facility will keep the spot open until Tuesday so that you can have a court hearing or address the case appropriately."

h.  ADAMS  then contacted SHORT, as ATTILA was not going to be in the office on Monday and advised SHORT, as follows:

_____

Angeline appears to be out on Monday so I wanted to bring this to your attention. The facility has agreed to hold the spot open until Tuesday. Iris is going to contact the mother to tell her that the only possible placement is across the state and to contact her attorney if she has a problem, As I stated in my previous email I do not see anything legally keeping us from moving the child, however, since you know your Judge better, I didn't know if we needed to attempt to get an emergency hearing. Please follow up with Iris and Jessica on Monday so they can either appear at the hearing or make arrangements to move the child.

77. **All of the discussions and plans to place M.A.F. in a nursing facility were conducted without the knowledge or consent of Freyre. Further, there were no exigent circumstances present to move M.A.F without a court hearing or other due process rights of Freyre.**

78.    It was not until April 22, 2011, that CPI VALDEZ finally informed Freyre of THE TEAM's plan to place M.A.F. in a nursing facility five hours away from Freyre. On Friday, April 22nd, CPI VALDEZ informed Freyre that M.A.F. would be moved to Miami the upcoming Tuesday. Freyre told CPI VALDEZ that she could not afford to travel to Miami to be with her daughter and that she has been caring for her daughter for 14 years. CPI VALDEZ informed Freyre that this matter would be further discussed with the Office of the Attorney General. Freyre stated that she wanted to be a part of that meeting. CPI VALDEZ told Freyre that she was not sure what was happening and that Freyre would have to wait until Monday for further information.

79.    When Freyre was advised of the transfer from Tampa General Hospital to Florida Club Care in Miami, she was very upset. At that time, Freyre advised the social worker and HKI and CPI employees that such attempts were in direct contravention to the Shelter order by Judge

_____

Vivian T. Corvo issued on March 30, 2011.  She advised that family wanted a hearing in front of the court on Monday prior to the transfer.

80.     ADAMS was made aware of Freyre's desire for a hearing and entirely disregarded Freyre's procedural due process rights.

81.     After Freyre expressed her objection to moving M.A.F. to a nursing facility in Miami where she would not be able to see or take care of her child, THE TEAM had several conversations crystalizing their efforts and facilitating the removal M.A.F. from her mother's care and custody solely due to Freyre's disability by taking the following actions:

      a.  On April 22, 2011, CPI VALDEZ spoke with Ms. Riley from HKI again to tell her about the conversations she had with ADAMS and Freyre. Ms. Riley confirmed that HKI would still have M.A.F.'s wheelchair transported on Tuesday.

      b.  CPI VALDEZ then emailed CPI PIETRZAK to update her on a possible hearing for M.A.F. on the upcoming Monday and asked CPI PIETRZAK to "please discuss" the matter with her.

      c.  On Monday, April 25, 2011, CPI PIETRZAK called SHORT to discuss M.A.F.'s case and left a message.

      d.  Two hours later CPI VALDEZ also called SHORT to discuss M.A.F.'s case and left a message.

      e.  CPI VALDEZ then called Freyre to tell her that CPI VALDEZ had not yet spoken with anyone from the Office of the Attorney General. Freyre then

reminded CPI VALDEZ that it was against the Court's order to keep M.A.F. away from Freyre.

    f.   Later that same day SHORT called CPI PIETRZAK and told her that there was no hearing set to have M.A.F. transported to Miami and there were no motions filed by Freyre's attorney to stop the move.

    g.   THE TEAM decided to move forward with removing M.A.F. from Freyre and placing M.A.F. in an institution without any further intervention from the Court.

82.    On Monday, April 25, 2011, Freyre filed a "Petition requesting urgent emergency hearing" to prevent the transfer of her daughter. Such attempts to invoke legal process and procedural guaranties were ignored by OAG ATTILA, SHORT, ARGERIOUS, and ADAMS, and they continued with their attempts to move M.A.F. away from her mother's custody.

83.    On Monday, April 25, 2011, OAG ATTILA filed a motion for M.A.F. to be administered psychotropic drugs because of denial of consent of Freyre. However, on April 25, she discovered that the motion was not going to be heard until May 9th, as the week of the 25th was a trial week for the Judge Peacock, and no motions were to be heard. As such, the CPI was advised by OAG Tiffany Short that they did not have to have a hearing to have the child transported to Miami, and asserted to CPI that there were no motions filed to stop the move.

84.    On April 22, 2011, in providing transfer orders, Dr. Karolina Dembinski of Tampa General Hospital stated that delaying M.A.F.'s medications would result in a high likelihood of intractable seizures which may possibly result in the death of M.A.F.

85.    Prior to discharge, Ms. Riley from HKI came to visit with Freyre and M.A.F. and brought along another person whom is actually going to transport M.A.F.'s wheelchair to Miami.

86.   HKI counselor Riley was talking to mom and providing support and copies of paperwork mom was demanding (copy of the consent to transfer, the court order, and a list of the SNFs in the state). Freyre was upset and was not in agreement with the plan in place. CPI PIETRZAK refused to allow Freyre to accompany M.A.F. in the ambulance to the geriatric nursing facility in Miami which was not going to provide M. A. F. with her scheduled anti-seizure medications, food, and water to keep her alive for that five hour transport.

87.   Freyre requested that she be allowed to accompany her daughter on the approximately five hour trip to ensure that Marie's needs were being met, including, but not limited to nutrition, hydration, medications  and emotional support, all of which she would have been able to provide during the transport. CPI PIETRZAK's refusal to allow Freyre to go on that ambulance transport with her daughter directly violated Freyre's unlimited visitation rights with her daughter. It also violated the duty to first obtain court approval before intentionally failing to administer M.A.F.'s required anti-seizure medications.

88.   Even though CPI PIETRZAK was aware that medications would need to be administered in transport, she did not review prior to transport, or ensure on the day of transport, that the ambulance company was going to administer the required medications, food, and water…and she was on direct notice on the day of transport that they would not do so.

89.   As a result of the lack of care and treatment during the transport and upon arrival at Florida Club Care, and the wrongful separation of her mother who was her main medical and emotional caregiver, M.A.F. was hysterical throughout the transport, became dehydrated, and was not administered her medications.  M.A.F. died soon after arrival at Florida Club Care.

90.     For years, Florida officials, including the defendants, have been aware of the pervasive, systemic practices in the State of Florida and Hillsborough County that have led to the institutionalization of children with disabilities and removal of such children from such parents because of the parent's physical, learning, or emotional inability to care for their children without assistance.  This pervasive, systemic problem includes the following issues cited by the United States Department of Justice in their Letter of Findings dated September 5, 2012[1]:

    a.  The failure to provide adequate home health or nursing care to parents with children with disabilities and then requiring such children to be removed from their parents or legal guardians; and

    b.  The failure to develop and provide medical foster homes to prevent such children from being institutionalized and limiting opportunities for reunification and community based care.

**FACTS AS TO ANIMUS AGAINST PEOPLE WITH DISABILITIES**

91.     In 2012, the National Council on Disability, an independent federal agency with fifteen Presidential Appointees charged with advising the President, Congress, and other federal agencies regarding policies, programs, practices, and procedures that affect people with disabilities, published a report regarding the discrimination and animus that people with disabilities face when raising children, entitled "Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children."[2]

92.     In this report, the National Council on Disability made the following findings:

---

[1] Available at http://www.ada.gov/olmstead/documents/florida_findings_letter.pdf
[2] Available at http://www.ncd.gov/publications/2012/Sep272012/

a.  The child welfare system relies on stereotypes and stigmas about people with disabilities which results in a disproportionate amount of people with disabilities becoming involved with the child welfare system.

b.  The child welfare system is ill-equipped to support people with disabilities with children and their families, which results in devastatingly high rates of people with disabilities losing their parental rights.

c.  People with disabilities and their children are overly, and often inappropriately, referred to child welfare services and, once involved, are permanently separated at disproportionately high rates.

d.  People with disabilities have their children removed at disproportionately high rates owing to a number of factors, including (1) state statutes that include disability as grounds for termination of parental rights; (2) perceived limits on the application of the ADA, especially at the termination phase; (3) bias, speculation, and the "unfit parent" standard; and (4) a lack of training in relevant systems regarding parents with disabilities.

e.  People with disabilities who are seeking or defending custody or visitation rights often encounter a system that is riddled with practices that discriminate against them, including (1) a system that is pervaded with bias; (2) inconsistent state laws, many that overtly discriminate against parents with disabilities, others that fail to protect them from unsupported allegations that they are unfit or create a detrimental impact on their children solely on the basis of presumption or speculation regarding the parental disability; and (3) a lack of

expertise or even familiarity regarding parents with disabilities and their children.

f.   People with disabilities who are involved in dependency or family proceedings regularly face evidence regarding their parental fitness that is developed using inappropriate and unadapted parenting assessments and a national dearth of resources to provide adapted services and adaptive parenting equipment, and to teach adapted parenting techniques. Even when such resources exist, dependency and family courts do not often use them.

g.   Systematic discrimination by state courts, child welfare agencies, and legislatures against parents with disabilities and their families has resulted in children of people with disabilities being removed from their parents with alarming frequency.

h.   In families where the parental disability is physical, 13 percent have reported pathologically discriminatory treatment in custody cases.

i.   Removing a child from a person with a disability based solely on parental disability clearly violates the ADA's prohibition of decisions based on a person's disability status. The full promise of the ADA will not be achieved until states stop denying parents with disabilities their fundamental right to create and maintain families.

j.   People with disabilities face discrimination and animus at every step of the child welfare system, starting with the initial report of suspected abuse or neglect. Most often for people without disabilities the report comes from an anonymous

_____

person, but for people with disabilities who have contact with service providers, reports of suspected abuse or neglect come from a state professional with whom the person with a disability has had contact and evidence suggests that CPS is likely to take allegations from state professionals more seriously, regardless of whether they are actually more valid.

k. People with disabilities are especially affected by the child welfare system due to historic oppression, current bias, denial of ADA-protected rights to accommodation and inclusion, and discriminatory statutes.

93. The HCSO demonstrated their animus towards people with disabilities with regards to their "inability" to care for children back in 2003 when a HSCO investigation indicated that M.A.F.'s grandmother could not care for M.A.F. because she has a mobility disability, M.A.F.'s grandfather could not care for M.A.F. because he "is disabled and ambulates slowly," and that M.A.F.'s uncle could not care for M.A.F. because he had an intellectual disability.

94. During the March 21, 2011 conversation between CPI PIETRZAK and NURSE EMERSON they expressed concern about Freyre's ability to care for M.A.F. solely because of her physical limitations due to her disability.

95. During the March 28, 2011 staffing meeting, Freyre's ability to care for M.A.F. because of her physical disability was discussed again. As a result of their discussion about Freyre's disability, it was decided that M.A.F. would be sheltered and taken from Freyre's care.

96. During the April 11, 2011 conversation between NURSE EMERSON and HKI, it was stated that "Doris cannot care for this child due to her physical disabilities and lack of support."

_____

97.     Rather than attempt to provide Freyre with the support she needed to care for her child at home, THE TEAM relied on stereotypes and stigmas about people with disabilities and agreed that Freyre could not care for M.A.F. because of her disability. As a result of THE TEAM's agreement, they began to move forward with plans to permanently remove M.A.F. from Freyre's care.

98.     At the April 14, 2011 status hearing, ATTILA further demonstrated THE TEAM's animus towards people with disabilities when she stated **twice** that Freyre could not care for M.A.F. because of her physical disability.

99.     The initial decision to remove M.A.F. from Freyre's care was because Freyre is a person with a disability and THE TEAM relied on stereotypes and stigmas about people with disabilities when determining that Freyre could not care for M.A.F. despite the HCSO's Investigative Summary from March 16, 2011 that stated "The mother appears to be able to meet the basic needs for the child."

100.    THE TEAM's agreement to work towards permanently removing M.A.F. from Freyre's care was also based on these stereotypes and stigmas about people with disabilities.

101.    Despite the Court's Order to provide Freyre with assistance in getting services so that M.A.F. could return home, THE TEAM continued to rely on false stereotypes and stigmas about people with disabilities and decided to directly contradict the Court's Order because THE TEAM believed Freyre could not care for M.A.F. solely because she had physical limitations.

102.    But for Freyre's physical limitations due to her disability, M.A.F. would never have been removed from Freyre's care.

_____

## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT BY NEXTGEN ALLIANCE, INC.

103.    The Plaintiffs repeat the allegations in paragraphs one through 102 of the Complaint as if fully set forth herein.

104.    Plaintiff is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the ADA.

105.    The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

106.    Further, the regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

107.    Public entities "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

108.    As a public entity, HKI is prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity

_____

to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 CFR 35.130(b)(1)(iii)

109.    HKI discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

110.    HKI discriminated against Plaintiff by working to separate Plaintiff from her daughter solely because Plaintiff has a disability.

111.    HKI purposefully and recklessly ignored lawful Court Order that ordered such accommodations to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community, notwithstanding such order HKI began planning for M.A.F.'s transfer to the nursing facility in Miami and coordinated the transportation for M.A.F.'s wheelchair.

112.    HKI further discriminated against Freyre and purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community, when HKI had the funds to provide three weeks of home health care services that would allow M.A.F. to go back home with her mother and stated that they would pay for these services, but instead worked to institutionalize M.A.F.

113.    HKI  have discriminated against the Plaintiff in violation of the ADA on the basis of her disability by:

    a.    Segregating M.A.F. and failing to provide her with appropriate community based services;

_____

b.    Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

c.    Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

114.    As a result of HKI's violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

115.    Such actions of HKI were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against NEXTGEN ALLIANCE, INC., for all recoverable compensatory damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT II

### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT BY HILLSBOROUGH COUNTY SHERIFF'S OFFICE

116.    The Plaintiffs repeat the allegations in paragraphs one through 102 of the Complaint as if fully set forth herein.

117.    Plaintiff is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the ADA.

118.    The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

119.  Further, the regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

120.  Public entities "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

121.  As a public entity, HCSO is prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 CFR 35.130(b)(1)(iii)

122.  HSCO discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

123.  HSCO discriminated against Plaintiff by working to separate Plaintiff from her daughter solely because Plaintiff has a disability.

124.  HSCO discriminated against Plaintiff and purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community when HSCO employees began

planning for M.A.F.'s transfer to the nursing facility in Miami despite finding that Freyre was capable of caring for and meeting the basic needs M.A.F. The sole reason for removing M.A.F. from Freyre was because Freyre had physical limitations due to her disability.

125.   HSCO  have discriminated against the Plaintiff in violation of the ADA on the basis of her disability by:

    a.   Segregating M.A.F. and failing to provide her with appropriate community based services;

    b.   Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

    c.   Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

126.   As a result of HSCO's violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

127.   Such actions of HSCO were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against HILLSBOROUGH COUNTY SHERIFF'S OFFICE, for all recoverable compensatory damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

_____

## COUNT III

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT BY THE STATE OF FLORIDA

128.   The Plaintiffs repeat the allegations in paragraphs one through 102 of the Complaint as if fully set forth herein.

129.   Plaintiff is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the ADA.

130.   The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

131.   Further, the regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

132.   Public entities "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

133.   The STATE OF FLORIDA is prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal

opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 CFR 35.130(b)(1)(iii)

134.   The STATE OF FLORIDA discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

135.   The United States Department of Justice has found that THE STATE OF Florida's "policies and practices place other children with significant medical needs in the community at serious risk of institutionalization in nursing facilities."

136.   By not providing the 24 hours of home health care that was necessary to allow M.A.F. to remain in the community, THE STATE OF FLORIDA violated the ADA.

137.   The STATE OF FLORIDA purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community.

138.   The STATE OF FLORIDA  have discriminated against the Plaintiff in violation of the ADA on the basis of their disabilities by:

  a.  Segregating M.A.F. and failing to provide her with appropriate community based services;

  b.  Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

  c.  Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

139.   As a result of THE STATE OF FLORIDA's violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

140.   Such actions of the Defendants were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against THE STATE OF FLORIDA, for all recoverable compensatory damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IV

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT BY NEXTGEN ALLIANCE, INC.

141.   The Plaintiffs repeat the allegations in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

142.   This Count is a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §. 794(a).

143.   Plaintiff is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the Rehabilitation Act.

144.   Defendants HKI is a recipient of federal financial assistance.

145.   HKI has discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

_____

146.   HKI purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community when HKI began planning for M.A.F.'s transfer to the nursing facility in Miami and coordinated the transportation for M.A.F.'s wheelchair.

147.   HKI purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community.

148.   HKI have discriminated against the Plaintiff in violation of the ADA on the basis of her disability by:

     a.   Segregating M.A.F. and failing to provide her with appropriate community based services;

     b.   Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

     c.   Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

149.   As a result of HKI's violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

150.   Such actions of HKI were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against NEXTGEN ALLIANCE, INC. for all recoverable compensatory

damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## <u>COUNT V</u>
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT BY HILLSBOROUGH COUNTY SHERIFF'S OFFICE

151.   The Plaintiffs repeat the allegations in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

152.   This Count is a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §. 794(a).

153.   Plaintiff is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the Rehabilitation Act.

154.   Defendant HILLSBOROUGH COUNTY SHERIFF'S OFFICE is a recipient of federal financial assistance.

155.   HCSO discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

156.   HSCO discriminated against Freyre and purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community when HSCO employees began planning for M.A.F.'s transfer to the nursing facility in Miami despite finding that Freyre was capable of caring for and meeting the basic needs M.A.F. The sole reason for removing M.A.F. from Freyre was because Freyre had physical limitations due to her disability.

157.   HCSO discriminated against the Plaintiff in violation of the ADA on the basis of her disability by:

     a.   Segregating M.A.F. and failing to provide her with appropriate community based services;

     b.   Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

     c.   Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

158.   As a result of HCSO's violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

159.   Such actions of HCSO were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against HILLSBOROUGH COUNTY SHERIFF'S OFFICE for all recoverable compensatory damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VI

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT BY THE STATE OF FLORIDA

160.   The Plaintiffs repeat the allegations in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

_____

161.  This Count is a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §. 794(a).

162.  Plaintiff is both a qualified individual with a disability, and associated with a person with a disability within the meaning of the Rehabilitation Act.

163.  Defendants THE STATE OF FLORIDA is a recipient of federal financial assistance.

164.  The STATE OF FLORIDA discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and her subsequent death.

165.  The United States Department of Justice has found that THE STATE OF Florida's "policies and practices place other children with significant medical needs in the community at serious risk of institutionalization in nursing facilities."

166.  By not providing the 24 hours of home health care that was necessary to allow M.A.F. to remain in the community, THE STATE OF FLORIDA violated the ADA.

167.  The STATE OF FLORIDA purposefully and recklessly ignored lawful Court Orders to provide Plaintiff and M.A.F. required and necessary services to ensure that M.A.F. remained with her mother and in the community.

168.  THE STATE OF FLORIDA has discriminated against the Plaintiff in violation of the ADA on the basis of her disability by:

    a.  Segregating M.A.F. and failing to provide her with appropriate community based services;

    b.  Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s institutionalization and subsequent death;

_____

c.   Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;

169.   As a result of THE STATE OF FLORIDA's violations, the Plaintiff was damaged by the forced separation between her and her daughter and her daughter's subsequent death.

170.   Such actions of THE STATE OF FLORIDA were willful or in reckless disregard to the protected rights of the Plaintiff.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against THE STATE OF FLORIDA for all recoverable compensatory damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VII

### 42 U.S.C. § 1985 – CONSPIRACY TO DENY CIVIL RIGHTS BY IRIS C. VALDEZ; JESSICA PIETRZAK, JULIE EMERSON; ALEXIS ARGERIOUS, ANGELINE ATTILA, JILL ADAMS, TIFFANY SHORT, AND HKI

171.   The Plaintiffs repeat the allegations in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

172.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

_____

173.   At all times relevant hereto, VALDEZ and PIETRAK, as the Child Protective Investigators with the Hillsborough County Sheriff's Office, were acting under color of state law and were acting or purporting to act in the performance of their official duties.

174.   At all times relevant hereto, EMERSON, as a nurse employed by Children's Medical Services (CMS), a Division of the Florida Department of Health, an executive agency of the State of Florida, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

175.   At all times relevant hereto, ARGERIOUS, ATTILA, ADAMS, and SHORT, attorneys employed by Children's Legal Services, a division of the State of Florida Department of Children and Families, were acting under color of state law and were acting or purporting to act in the performance of their official duties.

176.   At all times relevant hereto, Creshanda Riley worked for Defendant HKI, and was acting under color of state law and was acting or purporting to act in the performance of her official duties.

177.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

178.   Further, it is one of the most time-honored Constitutional rights for parents to have the ability to raise their own children how they see fit.

179.   Federal law requires that reasonable efforts shall be made to preserve and reunify families (i) prior to the placement of a child in foster care, to prevent or eliminate the need for

_____

removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home.

180. Each of these individual Defendants, jointly and severally, entered into a conspiracy to deny FREYRE her rights as a parent of a child with a severe disability solely because of her own disability and failed to perform any reasonable efforts to preserve or reunify M.A.F. with her mother solely due to her disability.

181. Through a series of meetings, phone calls, emails, and in person communications, VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI reached an understanding that they would remove M.A.F. from Freyre. THE TEAM agreed to act, and indeed did act, to deprive Freyre of her constitutional right to raise her child.

    a. On March 21, 2011 CPI PIETRZAK spoke with NURSE EMERSON about Ms. Freyre and during this conversation there was a suggestion that Freyre should give up her rights to M.A.F. because of her physical limitations due to her disability.

    b. On March 28, 2011, a multi-disciplinary staffing meeting was held regarding M.A.F. and CPI PIETRZAK, NURSE EMERSON, and ARGERIOUS were involved in this meeting. At this meeting three of the defendants, CPI PIETRZAK, NURSE EMERSON, and ARGERIOUS came to an understanding and agreement to act to remove M.A.F. from Freyre's care when they discussed Freyre's physical disability and because they felt Freyre could not provide all of M.A.F.'s care due to her disability, they agreed to shelter M.A.F. based on prospective neglect.

_____

c.  On March 30, 2011, the STATE OF FLORIDA filed a petition in the Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County Florida to place M.A.F. in foster care because of the alleged medical neglect which was based **solely** on Freyre's disability.

d.  Immediately after M.A.F. was removed from Freyre's care, NURSE EMERSON began to look into foster homes and the possibility of placing M.A.F. in a nursing facility to keep M.A.F. away from Freyre's care solely because Freyre has a disability.

e.  Despite receiving an Order from the Court to assist Freyre with obtaining additional services and return M.A.F. to Freyre's care once those services were in place, THE TEAM continued with their conspiracy to keep M.A.F. away from Freyre.

f.  While the Director of Maxim stated that an application for 24 hour services through Medicaid if she could get a letter from the Court, **no efforts were made** to obtain a letter from the Court to request the additional hours.

g.  While HKI had the resources to cover three weeks of services which would have allowed M.A.F. to return to Freyre's care while attempting to get additional services permanently, **HKI never provided such services**, and instead worked to place M.A.F. in an institution.

h.  On April 11, 2011, despite the Court Order, THE TEAM decided to **stop all attempts** to obtain additional hours of services.

i.   That same day CPI PIETRZAK and NURSE EMERSON continued discussing the possibility of placing M.A.F. in an institution.

j.   On April 12, 2011, Freyre told CPI PIETRZAK that she was opposed to the actions being taken to keep M.A.F. away from Freyre's care and that she felt M.A.F.'s life was in danger. Despite this, CPI PIETRZAK and the rest of THE TEAM continued to work towards permanently removing M.A.F. from Freyre's care.

k.   On April 13, 2011, as a result of THE TEAM's agreement to institutionalize M.A.F. instead of returning her to Freyre's care, ATTILLA  filed a Petition for Adjudication of Dependency and stated **twice** that because of Freyre's physical limitations she could not care for M.A.F. ATTILA also stated that there were **no services offered** to Freyre despite the Court's Order to help Freyre obtain 24 hour in home services.

l.   CPI PIETRZAK collaborated with ATTILA on this Petition by filing an Affidavit of Good Faith Filing in an attempt to permanently remove M.A.F. from Freyre's care.

m.   During the Status Hearing, ATTILA knowingly misrepresented the facts to the Court by stating that Medicaid had been contacted regarding 24 hour care even though **no one contacted Medicaid**.  ATTILA further misrepresented the facts when she stated that the previous judge suggested foster care placement even though the previous judge specifically ordered that M.A.F. be returned to Freyre and that Freyre should receive assistance in obtaining 24 hour care.

n.   On April 15, 2011, HKI continued to move forward with THE TEAM's plan to remove M.A.F. from Freyre's care when HKI began looking into having M.A.F. approved for a skilled nursing facility and relocating her to a skilled nursing facility.

o.   On April 19, 2011, because of THE TEAM's efforts, M.A.F.  was  approved for extensive additional funding to place her into a geriatric nursing facility.

p.   On April 22, 2011, with the help of Rosana Riveria, HKI found a nursing facility to place M.A.F. into, despite the Court's order to allow M.A.F. to return to Freyre's care.

q.   That same day a series of conversations occurred between CPI VALDEZ , ADAMS, SHORT, ATTILA, and Ms. Riley at HKI to coordinate plans in furtherance of their conspiracy to move M.A.F. and her wheelchair to Miami, away from Freyre's care. All of these conversations and plans to place M.A.F. in a nursing facility five hours away from Freyre were conducted without the knowledge or consent of Freyre.

r.   When CPI VALDEZ finally contacted Freyre to inform of THE TEAM's plan to move M.A.F. to Miami, Freyre told CPI VALDEZ that she could not afford to travel to Miami to be with her daughter and that she was opposed to this plan. Freyre also specifically stated that this plan was against the Court's Order to allow M.A.F. to return to Freyre's care. Freyre also stated she wanted a hearing on this issue before M.A.F. was moved. ADAMS was aware of Freyre's desire for a hearing.

s.   Despite the Court Order and Freyre's specific opposition and request for a hearing, CPI VALDEZ continued moving forward with THE TEAM's plans to remove M.A.F. by contacting Ms. Riley from HKI to discuss moving M.A.F.'s chair and emailing CPI PIETRZAK to ask her to discuss moving M.A.F. to the facility in Miami.

t.   On April 25, 2011, THE TEAM continued to move forward with the plan. Both CPI VALDEZ and CPI PIETRZAK contacted SHORT to discuss moving M.A.F. to the facility in Miami. SHORT told CPI PIETRZAK that there were no motions filed by Freyre's attorney to stop the move and they did not need a hearing to move M.A.F.

u.   On the same day Freyre spoke with CPI VALDEZ and again stated that moving M.A.F. was against the C ourt's order. Freyre also filed a Petition requesting an emergency hearing to stop the transfer of M.A.F. Despite this, THE TEAM continued with their conspiracy to remove M.A.F. from Freyre's care.

v.   On April 26, 2011, both Ms. Riley from HKI and CPI PIETRZAK went to the hospital where M.A.F. had been needlessly kept for weeks, to ensure that THE TEAM's plan to remove M.A.F. from Freyre was completed by having M.A.F. transported in an ambulance to the nursing facility in Miami and refusing to allow Freyre to accompany her daughter on the five hour trip despite the Court's Order that stated Freyre had unlimited visitation.

182.   VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI began planning to permanently remove M.A.F. from Freyre's care in March and continued

_____

with this plan in direct contradiction with the Court's instructions. THE TEAM eventually succeeded in their plan to remove M.A.F. from Freyre permanently by placing her in a nursing facility. As a result, M.A.F. died.

183.    The **<u>sole</u>** reason that VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI conspired to remove M.A.F. from Freyre's care was because Freyre is a person with a disability, and the stereotype that people with disabilities are unable to properly care for children.

184.    In a series of documented conversations, emails, phone calls, petitions to the court, and even in court proceedings, VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI have repeatedly stated that the reason THE TEAM was working to remove M.A.F. from Freyre's care was because of her "physical limitations."

185.    A number of site visits and conversations with M.A.F.'s primary care physicians revealed that Freyre competently and lovingly cared for M.A.F. M.A.F.'s physician stated that she had no concerns about M.A.F.'s health or Freyre's caring for M.A.F. Site visits revealed M.A.F. was in a clean environment, was fed and groomed appropriately, and Freyre had no criminal background. The CPI even explicitly stated that "[t]he mother appears to be able to meet the basic needs for the child." All other conversations and documents indicate the only reason M.A.F. was taken from Freyre is because Freyre had a disability that caused her to have physical limitations.

186.    VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI then acted in furtherance of their conspiracy to remove M.A.F. from Freyre's care by discussing placing M.A.F. in a facility and then beginning to make concrete plans to place

M.A.F. in a skilled nursing facility on or about April 13, 2011. Their plans included contacting nursing facilities to discuss placement; working to get M.A.F. approved for a skilled nursing facility placement; making arrangement to move, and eventually moving, M.A.F.'s wheelchair to the nursing facility; and making arrangements to move, and eventually moving, M.A.F. to the nursing facility in Miami.

187.    Freyre was injured by this conspiracy because she lost her constitutional right to raise her child by sole reason of her disability.

188.    At all times material hereto, VALDEZ, PIETRAK, EMERSON,  ARGERIOUS, ATTILA, ADAMS, SHORT and HKI were deliberately indifferent and/or acted with reckless disregard to M.A.F. health, safety, and welfare and FREYRE's Constitutional and federal rights, as follows:

   a.   By failing to comply with lawful court orders to request home health aide services to be provided in the home from midnight to 7:00 A.M.,

   b.   By failing to provide home health aide services in the home from midnight to 7:00 A.M. despite availability of funding;

   c.   By deliberately making misrepresentation to the presiding court of any efforts to provide assistance for unification of M.A.F. to FREYRE and thus denying due process;

   d.   By transferring M.A.F. to an institutional placement five hours away from her mother, without any lawful authority and contrary to the pleading of FREYRE;

   e.   By denying FREYRE any legal remedy or process to prevent the transfer to the remote institutional placement;

_____

f.   By failing to provide M.A.F. the necessary care, medication and treatment necessary for a safe transfer to the remote institutionalization;

g.   By deliberately preventing FREYRE to travel with her daughter M.A.F. and allowing her to ensure proper care and treatment for M.A.F. during her transfer;

h.   Thus causing the death of M.A.F. soon after her transfer due to the lack of necessary care and treatment while in state custody.

189.   VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI enforced a policy and practice of denying persons with Disabilities to have custody of their child when they are physically unable to care for their children without available aids and supports.

190.   VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI took said actions knowing FREYRE would be denied lawful custody of her daughter and M.A.F. would be at a substantial risk of serious harm.

191.   Despite having the authority and means to remedy the unconstitutional treatment of FREYRE, VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI were deliberately indifferent and/or recklessly failed to take immediate action to ensure that FREYRE was able to be reunified with her daughter.

192.   VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including FREYRE suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

_____

193.    The actions of VALDEZ, PIETRAK, EMERSON, ARGERIOUS, ATTILA, ADAMS, SHORT and HKI constitute a pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected rights and liberty and privacy interests of Plaintiffs herein. As a result, Plaintiff has been deprived of the substantive due process rights.

194.    The substantive due process rights include, but are not limited to: the right not to be subject to loss of life and liberty as a result of deliberate misrepresentations to a court of law, the right to not be separated from one's child without due process, the right to protection from unnecessary harm while in government custody, the right to a living environment that protects a child in custody physical, mental and emotional safety and well-being,  the right to services necessary to prevent a child in custody from deteriorating or being harmed physically, psychologically, or otherwise in governmental custody, including, but not limited to the right to safe and secure foster care placements, and appropriate planning and services directed towards reestablishment of the family unit

195.     FREYRE  is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against VALDEZ, PIETRAK, EMERSON,  ARGERIOUS, ATTILA, ADAMS, SHORT and HKI for all recoverable compensatory and punitive damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

_____

**COUNT VIII**
**42 U.S.C. §1983 CLAIM AGAINST NEXTGEN ALLIANCE, INC.**

196.    The Plaintiffs repeat the allegations in paragraphs 1 through 102 of the Complaint as if fully set forth herein

197.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Freyre's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws. applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

198.    At all times relevant hereto, HKI was a "person" and was acting under  color of state law within the meaning of 42 U.S.C. §1983.

199.    At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

200.    Pursuant to § 409.1671, Florida Statutes, DCF delegated responsibility for providing foster care and related services to lead agencies, which are defined both in the statute and the contract with DCF as the not-for-profit community-based care agency responsible for coordinating, integrating and managing a local system of supports and services for children.

201.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

202.    At all relevant times, it was clearly established that reasonable efforts are required to be made to preserve and reunify families (i) prior to the placement of a child in foster care, to

_____

prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home.

203.    Although § 409.1671 grants lead agencies such as HKI the authority to enter into subcontracts for specific services, it cannot and does not permit HKI to delegate their Constitutional and statutory duties to ensure the safety and well-being of each child in its care.

204.    As such, and at all relevant time hereto, HKI had a constitutional, statutory, and a non-delegable duty to ensure the health, welfare, and safety of each child in its custody and parents have a constitutionally protected liberty interest in the care, custody and management of their children.

205.    HKI has a practice to deny rights to a parent of a child when such parent has disability solely because of that parent's own disability and as such, HKI failed to perform any reasonable efforts to preserve or reunify M.A.F. with her mother solely due M.A.F.'s mother's disability.

206.    HKI violated Freyre's Constitutional rights as follows:

      i.   HKI represented to the Court that it would provide necessary services to FREYRE and M.A.F. to be able to be reunited with FREYRE and to ensure M.A.F.'s continuity of care and continued receipt of necessary care and services;

      ii.   HKI facilitated the transfer of M.A.F. to a remote institution without lawful authority and contrary to the wishes of the parent of the child.

      iii.   HKI established and enforced customs, policies, and/or practices which resulted in supervisors regularly failing to conduct supervisory reviews

_____

or when such reviews were conducted, failing to actually provide guidance and direction to the case managers, such as occurred in this case;

    iv.  HKI established and enforced customs, policies, and/or practices which resulted case managers regularly failing to ensure that parents with disabilities can be reunified with their children and receive necessary services to ensure reunification.

207.    HKI took said actions knowing it was exposing children who were in State custody, including M.A.F. and FREYRE, to a substantial risk of serious harm.

208.    Despite possessing the authority and means to remedy the unconstitutional treatment of FREYRE and M.A.F., HKI  was deliberately indifferent and/or recklessly failed to take immediate action to ensure that M.A.F. and all children like her received all necessary treatment and services and were not harmed while in State custody as well as preserving a parents right to reunification.

209.    HKI's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the separation of  FREYRE from M.A.F., and M.A.F.'s institutionalization, including FREYRE's suffering psychological harm and trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against HKI and for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

_____

### COUNT IX

**42 U.S.C. §1983 CLAIM AGAINST HILLSBOROUGH COUNTY SHERIFF'S OFFICE**

210.     The Plaintiffs repeat the allegations in paragraphs 1 through 102 of the Complaint as if fully set forth herein

211.     This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Freyre's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws. applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

212.     At all times relevant hereto, GEE was a "person" and was acting under color of state law within the meaning of 42 U.S.C. §1983.

213.     At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

214.     Pursuant to § 409.1671, Florida Statutes, DCF delegated responsibility for providing foster care and related services to lead agencies, which are defined both in the statute and the contract with DCF as the not-for-profit community-based care agency responsible for coordinating, integrating and managing a local system of supports and services for children.

215.     At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

216.     Although § 409.1671 grants lead agencies such as GEE the authority to enter into subcontracts for specific services, it cannot and does not permit GEE to delegate their Constitutional and statutory duties to ensure the safety and well-being of each child in its care.

_____

217.     As such, and at all relevant time hereto, GEE had a constitutional, statutory, and a non-delegable duty to ensure the health, welfare, and safety of each child in its custody and the knowledge that  parents have a constitutionally protected liberty interest in the care, custody and management of their children.

218.     Further, it is one of the most time-honored Constitutional rights for parents to have the ability to raise their own children how they see fit.

219.     At all relevant times, it was clearly established that reasonable efforts are required to be made to preserve and reunify families (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home.

220.     Despite clearly established rights, Defendant GEE had a practice to deny of denying persons with Disabilities to have custody of their child when they are physically unable to care for their children without available aids and supports and as such, failed to take any reasonable efforts to preserve or reunify M.A.F. with her mother.

221.     At all times material hereto, with full knowledge and approval of their acts, and pursuant to HSCO practice and policy, CPI VALDEZ and PIETRAK, were deliberately indifferent and/or acted with reckless disregard to M.A.F. health, safety, and welfare and FREYRE's Constitutional and federal rights, as follows:

      a.   By transferring M.A.F. to an institutional placement five hours away from her mother, without any lawful authority and contrary to the pleading of FREYRE;

      b.   By denying FREYRE any legal remedy or process to prevent the transfer to the remote institutional placement;

_____

    c.   By failing to provide M.A.F. the necessary care, medication and treatment necessary for a safe transfer to the remote institutionalization;

    d.   By deliberately preventing FREYRE to travel with her daughter M.A.F. and allowing her to ensure proper care and treatment for M.A.F. during her transfer;

    e.   Thus causing the death of M.A.F. soon after her transfer due to the lack of necessary care and treatment while in state custody.

222.    CPI PIETRAK enforced a policy and practice of denying persons with Disabilities to have custody of their child when they are physically unable to care for their children without available aids and supports.

223.    CPI VALDEZ, and PIETRAK, took said actions knowing FREYRE would be denied lawful custody of her daughter and M.A.F. would be at a substantial risk of serious harm.

224.    GEE deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including FREYRE suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

225.    GEE established and enforced customs, policies, and/or practices which resulted case managers regularly failing to ensure that parents with disabilities can be reunified with their children and receive necessary services to ensure reunification.

226.    GEE took said actions knowing it was exposing children who were in State custody, including M.A.F. and FREYRE, to a substantial risk of serious harm.

227.    Despite possessing the authority and means to remedy the unconstitutional treatment of FREYRE and M.A.F., GEE  was deliberately indifferent and/or recklessly failed to

_____

take immediate action to ensure that M.A.F. and all children like her received all necessary treatment and services and were not harmed while in State custody as well as preserving a parents right to reunification.

228.    HKI's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the separation of  FREYRE from M.A.F., and M.A.F.'s institutionalization, and death, including FREYRE's suffering psychological harm and trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

WHEREFORE, Plaintiff FREYRE prays that this Honorable Court enter a judgment in favor of FREYRE against GEE and for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

Respectfully submitted this 6th day of June, 2014.

DISABILITY INDEPENDENCE GROUP, INC
2990 Southwest 35th Avenue
Miami, Florida 33133
Phone (305) 669-2822
Facsimile (305) 442-4181
E-Mail: midetz@justDIGit.org


BY:    s/ Matthew W. Dietz
       MATTHEW W. DIETZ, ESQUIRE
       FL. BAR NO.: 0084905

_____

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of June, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to Shelley Cridlin, Office of the Attorney General, 501 East Kennedy Blvd., Suite 1100 Tampa, FL 33602, and Jason Gordillo, Esquire, Hillsborough County Sheriff's Office, 2008 East 8th Avenue, Post Office Box 3371, Tampa, FL 33601, and Benjamin S. Jilek, Joshua P. Welsh, Bush Ross, P.A., 1801 Highland Avenue, Tampa, FL 33602

DISABILITY INDEPENDENCE GROUP, INC
2990 Southwest 35th Avenue
Miami, Florida 33133
Phone (305) 669-2822
Facsimile (305) 442-4181
E-Mail: midetz@justDIGit.org


BY:   s/ Matthew W. Dietz
        MATTHEW W. DIETZ, ESQUIRE
        FL. BAR NO.: 0084905