# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**DORIS FREYRE,**

      **Plaintiff,**

**vs.**                                                   **Case No. 8:13-cv-02873-T-27TBM**

**HILLSBOROUGH COUNTY**
**SHERIFF'S OFFICE et al.,**

      **Defendants.**

_____/

## ORDER

**BEFORE THE COURT** are motions to dismiss the Second Amended Complaint (Dkt. 71) filed by Defendants Nextgen Alliance, Inc. (Dkt. 72), Jessica Pietrzak (Dkt. 73), Iris C. Valdez-Corey (Dkt. 74), Sheriff David Gee in his official capacity as Sheriff of Hillsborough County (Dkt. 75), the State of Florida (Dkt. 76), Julie Emerson (Dkt. 77), and Alexa Argerious, Angeline Attila, Jill Adams, and Tiffany Short (Dkt. 78). Plaintiff responded in opposition to each motion (Dkts. 81, 82, 83, 84, 85, 86).

Upon consideration, the motions to dismiss by Defendants Pietrzak, Valdez-Corey, Sheriff Gee, the State of Florida, and Emerson are DENIED. The motions to dismiss by Defendants Nextgen Alliance, Inc., and Argerious, Attila, Adams, and Short are GRANTED in part and DENIED in part.

## I.   INTRODUCTION

The facts as alleged in the Second Amended Complaint (Dkt. 71) are as follows. Plaintiff Doris Freyre claims to be disabled due to a back injury and carpal tunnel syndrome, which have left her unable to lift more than ten pounds. (*Id.* ¶ 31). Freyre's daughter, M.A.F., was born with severe

1

developmental and physical disabilities and required assistance with all daily tasks until her death at age 14. (*Id.* ¶¶ 32-33). M.A.F. could not lift or move herself without assistance, and remained in a wheelchair or in bed at all times. (*Id.*) Until the events giving rise to this lawsuit, Freyre cared for M.A.F. as a single parent, and received home health care assistance from 7 a.m. until midnight, but had no assistance in the early morning. (*Id.* ¶¶ 36-37).

On March 15, 2011, the Hillsborough County Sheriff's Office received an allegedly false report that Freyre was not properly caring for M.A.F. (*Id.* ¶ 39). As a result of the report, Defendant Jessica Pietrzak, a Child Protective Investigator ("CPI") for HCSO, began investigating Freyre's care of M.A.F. (*Id.* ¶ 40). On March 21, Pietrzak spoke with M.A.F.'s care coordination nurse, Defendant Julie Emerson, who worked for Children's Medical Services, a division of the Florida Department of Health. (*Id.* ¶¶ 21, 43). Emerson allegedly said Freyre "seems to be overwhelmed" and because of her disability, could not properly care for M.A.F., and "no other family or back up care exists for the child" from midnight to 7 a.m. (*Id.* ¶ 43).

One week later, a "multi-disciplinary staffing" was convened between Defendants Emerson, Pietrzak, and Alexa Argerious, an Assistant Attorney General for Children's Legal Services, along with Maxim Home Healthcare Supervisor Erin Thompson, Child Protection Specialist Laura Dill, "CMS FHP" Joanne White, and HCSO CPI General Manager Heather Grates. (*Id.* ¶ 44). At the meeting, home health care aides and Emerson stated that because of Freyre's disability, she could not provide care for M.A.F. without assistance, and the individuals present decided to shelter M.A.F. at Tampa General Hospital. (*Id.* ¶¶ 44-45). Argerious filed a petition to shelter on March 30. (*Id.* ¶ 46). After M.A.F.'s removal from Freyre's home, but before court action, Emerson began working to permanently move M.A.F. into a group home or nursing home. (*Id.* ¶ 48).

The Circuit Court for the Thirteenth Judicial Circuit in Hillsborough County granted the

petition for shelter at a hearing, but stated that Freyre was entitled to unlimited visitation with M.A.F., and directed that M.A.F. was to be returned home as soon as home health care was secured from midnight to 7 a.m. (*Id.* ¶¶ 49-50). Kris Carstens, a resource specialist with Defendant Hillsborough Kids, Inc. ("HKI")[1] attempted to procure home health assistance during the early morning hours. (*Id.* ¶¶ 51, 53). On April 11, 2011, Emerson told Carstens to stop trying to obtain additional care for M.A.F., because Medicaid would not pay for it. (*Id.* ¶ 56). Emerson's statement was allegedly "knowingly false," and HKI had reason to know so. (*Id.* ¶¶ 57-58). Emerson also falsely stated that M.A.F. did not qualify for medical foster care services. (*Id.* ¶ 60). The same day, Defendants Emerson and Pietrzak discussed moving M.A.F. to a foster home, despite the court order. (*Id.* ¶¶ 59, 61-62). Several of the Defendants allegedly agreed to obtain permanent institutionalized care for M.A.F., rather than returning her to Freyre, over Freyre's objections. (*Id.* ¶¶ 59, 62). On or about April 13, 2011, HKI and HCSO employees agreed not to return M.A.F. to Freyre's care. (*Id.* ¶¶ 63-64). The same day, Defendant Angeline Attila, an Assistant Attorney General for the State of Florida, filed a dependency petition, seeking to remove M.A.F. from Freyre's care. (*Id.* ¶¶ 65-69). Attila allegedly made a series of misrepresentations to the Circuit Court regarding Freyre's disability, M.A.F.'s condition, the court's comments from the March 30 hearing on the shelter petition (the April 13 hearing was in front of a different judge), and the availability of 24-hour Medicaid assistance for M.A.F. (*Id.*) The Circuit Court ultimately determined that the previously entered shelter order could not be dissolved without an evidentiary hearing, which was set for the week of June 20, 2011. (*Id.* ¶ 70).

Meanwhile, HKI began to work to locate a nursing facility that could house M.A.F. permanently, without Freyre's knowledge. (*Id.* ¶¶ 72-75). A nursing home in Miami agreed to take

---

[1] Hillsborough Kids, Inc. changed its name to Nextgen Alliance, Inc. on July 26, 2013 (Dkt. 29 ¶ 17), and is named as a Defendant under the latter name. This Order will refer to it as HKI, as the parties do throughout the pleadings.

M.A.F. (*Id.* ¶ 75). On April 22, 2011, several separate discussions took place between Defendants Iris Valdez-Corey (HCSO CPI Supervisor) and Tiffany Short and Jill Adams (Assistant Attorneys General) regarding moving M.A.F. to the nursing home in Miami. Adams initially recommended first seeking a judge's permission but later told Short it was not necessary. (*Id.* ¶ 76(a-h)). Short called Defendant Pietrzak to confirm M.A.F.'s transport to Miami could go ahead, as no motions had been filed to block the move. (*Id.* ¶¶ 81(f-g), 83). The same day, Defendant Valdez-Corey and HKI employee Creshanda Riley discussed the protocol for M.A.F.'s transport to Miami and HKI's transport of M.A.F.'s wheelchair. (*Id.* ¶ 81(a)).

Freyre first learned of the planned move on April 25 and immediately objected to Valdez and Adams, to no avail. (*Id.* ¶¶ 78-80). Freyre filed a petition to block the move on the same day, but it was allegedly ignored by the Assistant Attorney General Defendants. (*Id.* ¶ 82). Freyre asked to accompany M.A.F. on the trip to Miami, but Pietrzak denied her request, in violation of Freyre's unlimited visitation rights. (*Id.* ¶ 87). M.A.F. was "hysterical" throughout the transport, and was not provided with adequate medication, food, and water, despite Pietrzak and others being on notice of her requirements. (*Id.* ¶¶ 87-89). As a result of the lack of care in the ambulance and the separation from her mother, M.A.F. died soon after she arrived at the nursing home in Miami. (*Id.* ¶ 89).

Freyre brings nine separate counts against ten Defendants in the Second Amended Complaint. All claims are brought on her own behalf, not M.A.F.'s. Counts I, II, and III allege violations of Title II of the Americans with Disabilities Act ("ADA") by HKI, Sheriff Gee, and the State of Florida, respectively, claiming that the public entities discriminated against Freyre and denied her benefits because she was disabled. Counts IV, V, and VI bring virtually identical claims against the same defendants based on the Section 504 of the Rehabilitation Act ("RA"). Count VII is a claim for conspiracy to deny civil rights brought under 42 U.S.C. § 1985(3) against Valdez-Corey, Pietrzak,

4

Emerson, Argerious, Attila, Adams, Short, and HKI. These Defendants conspired to deprive Freyre of her constitutional rights to raise M.A.F. and to be reunited with M.A.F., Freyre contends. Count VIII and IX assert violations of 42 U.S.C. § 1983 against HKI and Sheriff Gee, by removing M.A.F. from Freyre's care and preventing their reunification.

Claims based on the ADA, RA, and § 1985(3) were brought in the First Amended Complaint, and were dismissed without prejudice for various reasons. (*See* Dkts. 66, 68). The § 1983 claims, also stated in the First Amended Complaint, largely survived the previous orders on the first set of motions to dismiss. (*See id.*).

## II.   STANDARD

A complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule does not require detailed factual allegations, but it demands more than an unadorned, conclusory accusation of harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007),

*rev'd sub nom. Ashcroft v. Iqbal*, 556 U.S. 672 (2009)). Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief. *Id.*

All of the factual allegations contained in the complaint must be accepted as true for the purposes of a motion to dismiss, but this tenet is "inapplicable to legal conclusions." *Id.* at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. All reasonable inferences must be drawn in the plaintiff's favor. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

## III.   DISCUSSION

### A.   ADA and RA Claims

Counts I, II, and III allege that HKI, Sheriff Gee, and the State of Florida (collectively, the "Institutional Defendants"), respectively, violated Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Counts IV, V, and VI allege the same defendants violated Section 504 of the RA, 29 U.S.C. § 794(a),[2] which is interpreted similarly to Title II of the ADA. *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1132 n.2 (11th Cir. 1996). Each of the defendants present related arguments why Counts I-VI should be dismissed. First, they contend that Freyre lacks individual or associational standing under both the ADA and RA. Second, they argue that the alleged injuries are not fairly traceable to their conduct, another requirement of standing. Third, some of the defendants argue that Freyre has failed to state

---

[2] Section 504 of the RA states in relevant part: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

a claim based on the ADA and RA, because she does not qualify as disabled. Fourth, they claim Freyre has insufficiently alleged the discriminatory intent required for compensatory damages. Finally, they dispute whether the allegations are sufficient for vicarious liability, as the Institutional Defendants can only act through their employees or agents. Each argument will be considered in turn.

### 1.      Standing

To demonstrate standing, Freyre must show (1) that she has suffered an injury-in-fact that is concrete and particularized, and not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) a favorable judgment is likely to redress the injury. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). As Plaintiff, Freyre bears the burden of establishing standing, *Lujan*, 504 U.S. at 461, and standing must be established for each claim she raises. *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1253-54 (11th Cir. 2010). The first two elements of standing are at issue here.

### a.      Individual Standing

The Institutional Defendants briefly argue or simply assume Freyre lacks standing in her own right to sue under the ADA and RA. (Dkt. 72 at 8; Dkt. 75 at 7, Dkt. 76 at 8-9).[3] Their arguments are unpersuasive. Freyre alleges that Defendants removed M.A.F. from her custody to Tampa General Hospital and later to a nursing home in Miami because they believed *Freyre's* disabilities prevented her from properly caring from her daughter. (Dkt. 71 ¶¶ 45-46, 50, 54, 59, 63, 76, 81, 94-102). As discussed below, Freyre contends she was disabled or treated as such by the Institutional Defendants because of her limitations in lifting and caring for her child. (*Id.* ¶ 31). These allegations

---

[3] As noted, Freyre only brings claims in her own right, not on behalf of M.A.F. (*See* Dkt. 71).

are sufficient for Freyre to demonstrate individual standing and withstand the motions to dismiss, based on the Institutional Defendants' alleged discrimination in removing Freyre's child from her custody because of Freyre's disability, and denying benefits to Freyre, by refusing to approve in-home care, also allegedly based on her disability. *See* 42 U.S.C. § 12132.

### b.    Associational Standing

The Institutional Defendants also challenge Freyre's standing to bring ADA and RA claims based on injury arising out of her association with M.A.F.   HKI and Sheriff Gee argue the discrimination and services denied were only for M.A.F., not Freyre. In *McCullum v. Orlando Regional Healthcare System*, 768 F.3d 1135 (11th Cir. 2014), the Eleventh Circuit explained "the threshold for associational standing under both the RA and the ADA is the same: non-disabled persons have standing to seek relief under either statute only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *Id.* at 1143.

Here, Plaintiff's allegations satisfy the associational standing requirements of the RA and ADA. Freyre alleges the Institutional Defendants denied her benefits and discriminated against her in removing M.A.F. from her custody, denying the family in-home nursing care, and refusing to allow her to accompany M.A.F. in the ambulance to Miami. Each of these actions constituted an injury to Freyre separate from the injury to M.A.F. At this stage, Freyre's allegations are sufficient to overcome the motion to dismiss for lack of associational standing, as she has alleged she was discriminated against and denied services because of her association with M.A.F.

The cases cited by the Institutional Defendants are inapposite. In *Glass v. Hillsboro Sch. Dist. 1J*, 142 F. Supp. 2d 1286 (D. Ore. 2001) the court found there was no associational standing for parents who sued a school district seeking to obtain access for the parents' own autism specialists to the school's special education classrooms. The parents' claim was based "solely" on their status

8

as parents of children in the school district, and not based on "any separate and distinct denial of services to them." *Id.* at 1292. In *Simenson v. Hoffman*, No. 95-c-1401, 1995 WL 631804 (N.D. Ill. Oct. 24, 1995), the parents of a child with a genetic skin disorder who had lesions covering his body lacked associational standing to bring a claim against a doctor who had yelled at them and their child when the parents brought their child to the doctor's office for treatment. *Id.* at *1-2. The court held there was no "alleged discriminatory behavior . . . aimed at a parent." *Id.* at 6.

Here, Freyre was allegedly denied services she needed in her own right and discriminated against based on M.A.F.'s and her own disability. *See Tugg v. Towey*, 864 F. Supp. 1201, 1209 (S.D. Fla. 1994) (family members of deaf people have associational standing because family members would be "denied the mental health services *they need* to help their deaf" relatives.) (emphasis added). As in *Tugg*, Freyre herself "needed" the services to care for her disabled daughter which were denied, and therefore has associational standing.[4]

### c.    Injuries Fairly Traceable to Defendants' Conduct

Each Institutional Defendant also contends that Freyre's injuries were not fairly traceable to its conduct. It is important to note that the traceability requirement arising from Article III is "something less than the concept of proximate cause." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) (quotation omitted). Indeed, "no authority even remotely suggests that proximate causation applies to the doctrine of standing." *Loggerhead Turtle v. County Council*, 148 F.3d 1231, 1251 n. 23 (11th Cir.1998). "Instead, even harms that flow indirectly from the action in question can be said to be "fairly traceable" to that action for standing purposes." *Focus on the Family*, 344 F.3d at 1273.

Freyre has sufficiently alleged at least "indirect" harm flowing from the actions of each

---

[4] Institutional Defendants' challenge to Freyre's individual and associational standing may be renewed on summary judgment based on a more developed factual record.

Institutional Defendant to satisfy the traceability requirement. For HKI, Freyre alleges that it ceased attempting to find 24-hour care for M.A.F. despite a court order, relying on a statement from Nurse Emerson that HKI knew was false. (Dkt. 71 ¶¶ 50, 54-58). Freyre also alleges that HKI facilitated M.A.F.'s placement and transfer to the nursing home in Miami. (*Id.* ¶¶ 71-72, 76, 86). While these actions may have only "indirectly" led to M.A.F.'s death, no more is required to satisfy the traceability requirement. *Focus on the Family*, 344 F.3d at 1273.

Freyre alleges that Sheriff Gee's employees participated in the process that led to the institutionalization of M.A.F. at Tampa General Hospital, played a role in the joint decision not to seek Freyre's consent before moving M.A.F. to Miami, and refused to allow Freyre to ride in the ambulance with M.A.F. to Miami. (*Id.* ¶¶ 42-45, 61, 76-78, 87-88). As with HKI, these actions are sufficient for the alleged injury to be fairly traceable to Sheriff Gee.

Finally, the State of Florida's argument on traceability begs credulity. Freyre has alleged Nurse Emerson's false statements that Medicaid would not authorize in home treatment and advocacy for an institutional placement for M.A.F. set the process in motion that resulted in Freyre's shelter at Tampa General, transfer to Miami, and eventual death. (*Id.* ¶¶ 43, 56). The alleged injuries are "fairly traceable" to the State of Florida's actions. *Lujan*, 504 U.S. at 560.

### 2.   *Stating ADA and RA Claims*

The Institutional Defendants also contend that Freyre has failed to state a claim under Title II of the ADA and Section 504 of the RA. "To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated [against] by such entity; (3) by reason of such disability." *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quotation and citation omitted). The RA's statutory text echoes the ADA's, with the exception of requiring that the challenged program receive federal aid.

29 U.S.C. § 794(a); *Badillo v. Thorpe*, 158 Fed. Appx. 208 (11th Cir. 2005) ("With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable.").

### a.      Individual with a Disability

The State of Florida and Sheriff Gee contend that Freyre is not a "qualified individual with a disability" for statutory purposes. This argument cannot stand for two reasons. First, the defendants rely on cases from the 1990s finding that lifting restrictions do not substantially limit major life activity, the statutory definition of disability, (Dkt. 76 at 10-11), but in 2008, Congress amended the ADA to add "lifting" to the definition of major life activities. *Shannon v. Postmaster General*, 335 Fed. Appx. 21, 25 (11th Cir. 2009). Second, Freyre sufficiently alleges that the Institutional Defendants discriminated against her and denied her services based on their perception that she was disabled. (Dkt. 71 ¶ 43, 45, 50, 56, 59, 68, 76). The ADA applies to persons "perceived" to be disabled, and therefore her allegations are sufficient to establish she was a qualified individual with a disability. 42 U.S.C. ¶ 12101(3)(A).

### b.      Exclusion from Benefits

Sheriff Gee challenges the sufficiency of Freyre's allegations of discrimination or the denial of services.  Sheriff Gee asserts his office did not deny any required services to Freyre. (Dkt. 75 at 4-5). Freyre alleges, however, Sheriff Gee's employees acted to shelter M.A.F. at Tampa General and transfer her to a nursing home in Miami, because they believed Freyre's disabilities prevented her from properly caring for M.A.F. (Dkt. 71 ¶¶ 59-62, 86-87). In certain circumstances, the unnecessary institutionalization of disabled people can violate Title II of the ADA. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600-607 (1999). Freyre's allegations are sufficient to state a claim that the treatment of herself and M.A.F. was discriminatory and a denial of benefits under the ADA and RA.

### c.    Discriminatory Intent

To receive compensatory damages for a violation of § 504 of the RA,[5] a plaintiff must demonstrate "discriminatory intent." *T.W. v. School Board*, 610 F.3d 588, 604 (11th Cir. 2010). Discriminatory intent may be proven by a showing of "deliberate indifference." *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). Deliberate indifference requires a showing "the defendant *knew* that harm to a federally protected right was substantially likely and ... *failed* to act on that likelihood." *Id.* at 344 (citation omitted).

Freyre has sufficiently alleged "deliberate indifference" on the part of each of the Institutional Defendants. HKI had knowledge that the transportation of M.A.F. to Miami could have violated Freyre's constitutional rights to parent her child, and failed to act on that knowledge. (Dkt. 71 ¶¶ 81, 85-86). The actions of Sheriff Gee's employees contributed to M.A.F.'s initial removal from Freyre's home and her transportation to Miami. (*Id.* ¶¶ 40-43, 76, 81, 87-89). And the State of Florida's employees, including Nurse Emerson, made representations that led to M.A.F.'s fateful move to the nursing home. (*Id.* ¶¶ 43, 48, 56-57, 60). The Institutional Defendants essentially argue they were acting in good faith. At this stage, however, only the sufficiency of the pleadings is being tested, and the pleadings are sufficient to overcome their challenges.

### d.    Vicarious Liability

The final argument raised by the Institutional Defendants on Counts I-VI of the Second Amended Complaint relates to vicarious liability. As an initial matter, respondeat superior is available for claims based on Title II of the ADA. *T.W.*, 610 F.3d at 604; *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996). Because of the availability of respondeat superior, the ADA

---

[5]The Eleventh Circuit has not determined whether the same standard applies to Title II of the ADA, but other circuits have held that it does, *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (collecting cases), and generally, cases interpreting the two statutes are interchangeable. *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009).

claims against the Institutional Defendants are sufficient to overcome the motions to dismiss. The State of Florida argues that no official state actor was named, but Nurse Emerson's statements about the availability of Medicaid are enough for the purposes of vicarious liability at this stage. The Eleventh Circuit has not decided whether respondeat superior is sufficient for a § 504 RA claim. *See Liese*, 701 F.3d at 349 n.10. Nevertheless, even under the "narrower approach" articulated by the Supreme Court in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-90 (1998), the motions to dismiss are due to be denied. *Liese*, 701 F.3d at 349.

Gebser, which dealt with the liability of an organization under Title IX, held that the plaintiff must show the deliberate indifference of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser*, 524 U.S. at 290; *Liese*, 701 F.3d at 349. The discrimination complained of by Sheriff Gee's office and the State of Florida was based on discretionary actions by officials, who, taking the well-pleaded facts in the complaint as true, could have "institute[d] corrective measures" simply by reversing the decisions they made. (Dkt. 71 ¶¶ 40-43, 48, 56-57, 87-89). The allegations are less clear as to HKI. Other claims against HKI survive this motion to dismiss, including the ADA Title II claim, and determining who an official "is necessarily a fact-intensive inquiry." *Liese*, 701 F.3d at 350. Moreover, it is unclear whether the *Gebser* standard applies to § 504 claims rather than respondeat superior. *Id.* at 349 n.10. Therefore, HKI's argument based on *Gebser* is better suited for summary judgment.

## B. Conspiracy Claim: 42 U.S.C. § 1985(3)

Next, Freyre brings a claim based on a 42 U.S.C. § 1985(3) against eight defendants. The elements of a § 1985(3) claim are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997); *Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627-28 (11th Cir. 1992). *See United Brotherhood of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983).

Freyre's § 1985(3) claim was previously dismissed for two reasons: insufficient allegations of conspiracy, and failure to satisfy the second element of the claim, which requires allegations of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Scott*, 463 U.S. at 829; *Griffin v. Breckinridge*, 403 U.S. 88, 102 (1971); *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 970 F.2d 785, 793 (11th Cir. 1992). The conspiracy and discriminatory animus requirements will be considered in turn.

### 1.   *Allegations of Conspiracy*

"To establish a prima facie case of conspiracy . . . the plaintiff must allege, among other things, that the defendants reached an understanding to violate his rights." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002) (quotation omitted) (in a summary judgment context). "The plaintiff does not have to produce a smoking gun to establish the understanding or willful participation required to show a conspiracy, but must show some evidence of agreement between the defendants." *Id.* at 1283–84 (quotations and citation omitted). "Facts detailing the overt acts must be pled more specifically." *Arnold v. Board of Education*, 880 F.2d 305, 318 (11th Cir. 1989). A plaintiff must make "particularized allegations that Defendants reached an understanding to violate [plaintiff's] rights." *Youngblood v. Fla. Dep't of Health*, 224 Fed. Appx. 909, 915 (11th Cir. 2007).

In the Second Amended Complaint, Freyre makes sufficiently "particularized allegations"

14

of a conspiracy to violate her constitutional rights. Among the overt acts alleged[6] in the complaint are:

- March 21, 2011 telephone conversation between Defendants Jessica Pietrzak (HCSO Child Protective Investigator) and Julie Emerson (Florida Department of Health, Children's Medical Services Program) during which Emerson said Freyre "seems to be overwhelmed" and cannot properly care for M.A.F. (Dkt. 71 ¶ 43).

- March 28, 2011 meeting between Defendants Emerson, Pietrzak, and Alexa Argerious (Assistant Attorney General), and four other individuals, in which home health care aides and Emerson stated that because of Freyre's disability, she could not provide care for M.A.F. without assistance. The individuals present decided to shelter M.A.F. at Tampa General Hospital. (*Id.* ¶¶ 44-45).

- Discussion between Defendants Emerson and Pietrzak about moving M.A.F. to a foster home, between the time of M.A.F's removal from Freyre's care and the shelter hearing (on or about March 31, 2011). (*Id.* ¶ 48).

- April 11, 2011 discussion between Defendants Emerson and Pietrzak about moving M.A.F. to a foster home. (*Id.* ¶¶ 59, 61-62).

- April 15, 2011 discussions between Creshanda Riley, an employee of Defendant HKI, and other individuals, including at Tampa General Hospital, regarding moving M.A.F. to a nursing home. (*Id.* ¶¶ 71-72, 75).

- Several separate discussions on April 22, 2011 between Defendants Iris Valdez-Corey (HCSO Child Protective Investigations Supervisor) and Tiffany Short and

---

[6]Among the alleged acts, some are protected by absolute immunity. For example, Defendant Attila filed a petition of dependency in state court to remove M.A.F. from Freyre's care, and Defendants Attila and Pietrzak made certain representations to the court in the petition and accompanying affidavits. (Dkt. 71 ¶¶ 65-70). As Freyre acknowledges (Dkt. 86), these statements are protected by absolute immunity. *Butz v. Economou*, 438 U.S. 478 (1978).

Jill Adams (Assistant Attorneys General) regarding moving M.A.F. to a nursing home in Miami. Adams initially recommended first seeking a judge's permission but later stated it was not necessary. (*Id.* ¶ 76(a-h)).[7] Short later called Defendant Pietrzak to confirm M.A.F.'s transport Miami could go ahead, as no motions had been filed to block the move. (*Id.* ¶ 81(f-g), 83).

- April 22, 2011 discussion between Defendants Valdez-Corey and HKI (Riley) confirming M.A.F.'s transport to Miami and HKI's transport of M.A.F.'s wheelchair. (*Id.* ¶ 81(a)).

As detailed for each Defendant below, Freyre alleges sufficient facts to tie most, but not all, of the Defendants to the alleged conspiracy.

### a.   CPI Defendants

Defendant Valdez-Corey is alleged to have coordinated plans to move M.A.F. to Miami along with Assistant Attorneys General Adams, Short, and Attila on April 22 and April 25, 2011. (Dkt. 71 ¶¶ 76, 78, 81). Freyre also alleges that Valdez-Corey worked with HKI to arrange for the transportation of M.A.F.'s wheelchair to Miami. (*Id.*) These allegations establish Valdez-Corey's participation in the alleged  conspiracy.

Notwithstanding, Valdez-Corey raises three arguments for dismissal of the claim against her. First, she argues she was not deliberately indifferent to Freyre's constitutional rights. This argument may be renewed at summary judgment, but at this stage, Valdez-Corey's alleged involvement in M.A.F.'s transfer to the nursing home in Miami, without her mother and in

---

[7] Freyre alleges conspiratorial acts among Defendants Attila, Adams, and Short. (Dkt. 71 ¶ 76 (g-h), 82). As stated in the previous order on the motions to dismiss, (Dkt. 66 at 12), coordination among Assistant Attorneys General is protected by the intracorporate conspiracy doctrine, which states an organization "cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc); *Denney v. City of Albany*, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (applying intracorporate conspiracy doctrine to government agencies). Similarly, discussions between Defendants Valdez-Corey and Pietrzak are protected. (*See, e.g.*, Dkt. 71 ¶ 81(b)).

contravention of court orders, states a claim. Valdez-Corey's claim that M.A.F.'s removal was justified is a question of fact to be resolved with the benefit of discovery. *See Doe v. Kearney*, 329 F.3d 1286, 1298-99 (11th Cir. 2003). Next, Valdez-Corey argues she is entitled to absolute immunity, because she was performing a quasi-judicial function. *See Butz v. Economou*, 438 U.S. 478 (1978). Some courts have extended the protections of absolute immunity to caseworkers filing dependency petitions. *See Ernst v. Child & Youth Servs. of Chester County*, 108 F.3d 486, 495 (3d Cir. 1997) (collecting cases). Even assuming absolute immunity protects the filing of dependency petitions, Freyre's allegations against Valdez-Corey are based on allegedly conspiring to move M.A.F. to Miami without court approval, not the filing of the shelter petition. Indeed, Valdez-Corey argues Freyre has not stated a claim against her because she was not involved in the filing of the shelter petition. (Dkt. 74 at 12). Therefore, the allegations do not facially give rise to absolute immunity.

Finally, Valdez-Corey argues the Eleventh Amendment immunizes her actions as an "arm of the state." *Shands Teaching Hospital & Clinics v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2011). This argument is not proper for disposition at this point, as determining whether an agency is an arm of the state requires consideration of four factors requiring facts outside the scope of the complaint. *See Miccosukee Tribe of Indians v. Florida State Ath. Comm'n*, 226 F.3d 1226, 1231 (11th Cir. 2000). Further, Valdez-Corey is being sued in her individual capacity, and would not ordinarily be entitled to Eleventh Amendment immunity. *Kentucky v. Graham*, 473 U.S. 159 (1985); *Wu v. Thomas*, 863 F.2d 1543, 1550 (11th Cir. 1989) (the Eleventh Amendment does not "preclude a damages award against state officials in their individual capacity.")

For similar reasons, Freyre's allegations against Defendant Pietrzak state a claim on the first and third elements of § 1985(3). On March 11, 2011, Pietrzak and Defendant Emerson discussed how to remove M.A.F. from Freyre's care because of Freyre's disability. (Dkt. 71 ¶

43). Pietrzak came to an understanding with Defendants Emerson and Argerious to remove M.A.F. on March 28, 2011, and on April 11, 2011, Pietrzak and Emerson discussed placing M.A.F. in a nursing home. (*Id.* ¶¶ 44, 48, 61). On April 25, 2011, Pietrzak discussed moving M.A.F. to Miami with Defendant Short, and the next day, Pietrzak, along with HKI's Riley, refused to allow Freyre to accompany M.A.F. in the ambulance to Miami. (*Id.* ¶¶ 81, 86-89).[8] Pietrzak raises the same defenses as Valdez-Corey, and for the same reasons, they do not require dismissal of Freyre's claim at this stage.

### b.    Defendant Emerson

Emerson is alleged to have discussed removing M.A.F. from Freyre's care with Pietrzak on March 11, 2011, and reaching an understanding with Pietrzak and Defendant Argerious to remove M.A.F. later that month. After M.A.F. was sheltered at Tampa General, Emerson allegedly began to look into moving her to a nursing home, and discussed doing so with Pietrzak on April 11, 2011. (*Id.* ¶¶ 43-44, 48, 61). Emerson contends these allegations are insufficient to state a conspiracy, and cites *Roy v. Board of County Com'rs*, No. 3-06-CV95/MCR/EMT, 2007 WL 3345352 (N.D. Fla. Nov. 9, 2007) for support. *Roy*, however, bolsters Freyre's position, by denying a motion to dismiss a § 1985(3) claim where plaintiffs alleged the existence of three overlapping agreements among five defendants to impede the building of a housing development. *Id.* at *10. Emerson claims that she did not know Defendant Valdez-Corey, but as *Roy* states, separate conspiracies can be joined by the acts of a "common agent." *Id.*

Emerson also raises the defenses of Eleventh Amendment immunity and qualified immunity. For the same reasons as the CPI defendants, Eleventh Amendment immunity does not require dismissal of the claim at this point, as facts outside the scope of the complaint must be

---

[8] Based on the four corners of the complaint, Pietrzak is entitled to absolute immunity for her affidavit at the April 13, 2011 dependency hearing (Dkt. 71 ¶¶ 66-67), but the other facts alleged are sufficient to state a claim.

analyzed to determine whether Emerson is an "arm of the state." Further, she is being sued in her individual capacity. *See supra*. Qualified immunity is not available for § 1985(3) claims. *Burrell*, 870 F.2d at 793.

### c.   Assistant Attorney General Defendants

The acts tying the Assistant Attorney General Defendants – Argerious, Attila, Adams, and Short – to the conspiracy will be considered in turn.

Argerious is alleged to have participated in just one act not subject to absolute immunity or the intracorporate conspiracy doctrine: the March 28, 2011 meeting at which the "decision was made to shelter M.A.F at Tampa General" because Freyre's disability made it difficult to care for her. (Dkt. 71 ¶¶ 44-45). Considering the ramifications of this act, it sufficiently states a claim for conspiracy against Argerious. The defenses Argerious raises, of Eleventh Amendment immunity and absolute immunity based on the executive and litigation privilege, require factual development not possible at the motion to dismiss stage.[9]

Attila filed a petition of dependency in state court which allegedly included false statements and presented them in the subsequent hearing. (*Id.* ¶¶ 65-69). It is evident from the face of the complaint that Attila is entitled to absolute immunity for these in-court statements. *See Hart v. Hodges*, 587 F.3d 1288, 1985 (11th Cir. 2009) (prosecutors have absolute immunity when engaged in judicial functions). No other allegations in the complaint are sufficiently particularized to link Attila to the conspiracy (excluding those acts subject to the intracorporate conspiracy doctrine).[10] Therefore, the claims against Attila will be dismissed.

Adams and Short are alleged to have been involved in discussions regarding M.A.F.'s

---

[9] As noted, Argerious is not entitled to qualified immunity. *Burrell*, 870 F.2d at 793.

[10] *See supra* note 7.

move to the nursing home in Miami. Adams told Valdez-Corey there was no legal impediment to

the move, and Short called Pietrzak to confirm that M.A.F.'s transport to Miami could proceed

without legal problems. (*Id.* ¶¶ 76(a-h), 81(f-g), 83). These allegations are sufficient to state a

claim, and as with Argerious, the defenses of Eleventh Amendment and absolute immunity

require factual development that has not yet occurred.

### d.  HKI

The final party named in the conspiracy count is HKI, which faces ADA, RA, and § 1983

claims that survive its motion to dismiss. HKI allegedly assisted others in finding a nursing home

for M.A.F. and worked with Valdez-Corey and Pietrzak to coordinate the transportation of

M.A.F.'s ambulance. (*Id.* ¶¶ 72, 76, 85-86). These allegations are sufficient to state a conspiracy

claim against HKI.

### 2.    *Class-Based Discriminatory Animus*

The second element of a § 1985(3) claim requires the plaintiff to allege "some racial, or

perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators'

action." *Scott*, 463 U.S. at 829; *Griffin*, 403 U.S. at 102; *see Burrell*, 970 F.2d at 793 (plaintiff

must show "a class-based invidiously discriminatory purpose behind the defendants' action.").

"This narrow intent requirement erects a significant hurdle for section 1985(3) plaintiffs,"

*Burrell*, 970 F.2d at 794, as § 1985(3) does "not provide a federal remedy for 'all tortious,

conspiratorial interferences with the rights of others.'" *Scott*, 463 U.S. at 834 (quoting *Griffin*,

403 U.S. at 101). Freyre is "required to allege facts supporting a reasonable inference of

intentional discrimination." *Ford v. Strange*, No. 14-10326, 2014 U.S. App. LEXIS 16986, at

*26 (11th Cir. Sept. 3, 2014). She must "tie [the] class-based motivation" to the acts of the

defendants. *Lyon v. Ashurst*, No. 08-16778, 2009 U.S. App. LEXIS 24726, at *7 (Nov. 9, 2009);

*Ford*, 2014 U.S. App. LEXIS 16986, at *29 n.25. Defendants challenge the discriminatory

animus requirement on two grounds: first, that § 1985(3) does not protect the disabled as a class, and second, that the allegations are insufficient to demonstrate animus.

### a.      Disability as Protected Class

The Eleventh Circuit has not decided whether the disabled are a protected class under § 1985(3). Circuit courts that have ruled on the question are split, with the Second, Third, and Eighth Circuits holding they are, and the Sixth, Seventh, and Tenth Circuits holding they are not. *See Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 42-43 (2d Cir. 1982) (allowing § 1985 claim against a partnership formed by town residents who attempted to block state from buying property to use as home for mentally disabled); *Lake v. Arnold*, 112 F.3d 682, 686 (3d Cir. 1997) (mentally disabled who were involuntarily sterilized protected by § 1985(3)); *Larson v. Miller*, 55 F.3d 1343, 1352-53 (8th Cir. 1995) (handicapped young girls protected) (vacated and later reinstated on other grounds); *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000) (mentally disabled not protected); *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1486-87 (7th Cir. 1985) (handicapped not protected); *Wilhelm v. Continental Title Co.*, 720 F.2d 1173 (10th Cir. 1983) (people with multiple sclerosis not § 1985 class; refusing to expand § 1985 classes beyond race). Two courts in this district have held the disabled are not a protected class under § 1985(3). *Larson v. Sch. Bd. of Pinellas County, Fla.*, 820 F. Supp. 596, 601 (M.D. Fla. 1993); *Corkery v. Superx Drugs Corp.*, 602 F. Supp. 42, 44-45 (M.D. Fla. 1985) (plaintiff with congestive heart failure who was fired from job cannot state § 1985(3) claim).

In holding the disabled were protected under § 1985(3), the Third Circuit stated it was "significant that the two appellate decisions construing section 1985(3) as too narrow to encompass the handicapped pre-dated the enactment of [the ADA, and] did not, therefore, consider the impact of Congress' specific findings with respect to the severity and ubiquity of discrimination against the handicapped." *Lake*, 112 F.3d at 688 n.11; *Trautz v. Weisman*, 819 F.

Supp. 282, 290-293 (S.D.N.Y. 1993) (same). *But see Bartell*, 215 F.3d at 560 (holding mentally disabled not protected by § 1985 after the enactment of the ADA). The Eleventh Circuit has extended the reach of § 1985(3) to conspiracies against women, and distinguished *Wilhelm* and its decision not to extend § 1985(3) beyond race in doing so. *See Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1339 (11th Cir. 1999). *Lyes* suggests § 1985(3) may have a greater reach to "conspiracies under color of state law," like the conspiracy alleged here. *Id.* at 1339-40. Moreover, there is authority to defer the question of whether the disabled can constitute a class under § 1985(3) to a later stage of the case. At the motion to dismiss stage, "there is no reason for this court to "rush to judgment" and attempt to predict what the Eleventh Circuit will ultimately decide about the merits of a disability conspiracy claim . . . ." *Henson v. City of Gadsden*, No. 4:14-cv-163-VEH, 2014 U.S. Dist. LEXIS 87477, at *8 (N.D. Ala. June 27, 2014). Accordingly, for the purposes of these motions, the Court will assume that the disabled can be protected by § 1985(3).

### b.   Animus Requirement

"Section 1985(3) actions often stand or fall on the plaintiff's ability to establish the . . . class-based, invidiously . . . discriminatory animus behind the conspirators' actions." *Burrell*, 970 F.2d at 794. Defendants argue that Freyre fails to sufficiently allege a discriminatory animus for their actions. The relevant allegations in the complaint include:

- 2003 investigation by HCSO which stated that M.A.F's grandmother, grandfather, and uncle could not care for M.A.F. because of their intellectual and physical disabilities. (Dkt. 71 ¶¶ 41, 93).

- March 21, 2011 telephone conversation between Defendants Pietrzak and Emerson during which Emerson said Freyre "seems to be overwhelmed" and because of her physical disability, could not care for M.A.F, despite Pietrzak's writing that Freyre

could properly for M.A.F. five days earlier (*Id.* ¶¶ 40, 42-43, 94, 99).

- March 28, 2011 meeting between Defendants Emerson, Pietrzak, and Alexa Argerious (Assistant Attorney General), and four other individuals, in which home health care aides and Emerson stated that because of Freyre's disability, she could not provide care for M.A.F. without assistance. (*Id.* ¶¶ 44-45, 95).

- April 11, 2011 discussion between Defendants Emerson and HKI in which Freyre's disabilities were given as the reason she could not care for M.A.F. (*Id.* ¶ 96).

- Representations by Defendants to state courts that Freyre could not care for M.A.F. because of her disability. (*Id.* ¶¶ 50, 63-69, 98).

- Systemic practices in Florida and Hillsborough County that result in the institutionalization of children with disabilities who have disabled parents. (*Id.* ¶ 90).

Taking Freyre's well-pleaded allegations as true, as they must be at this stage of the case, she sufficiently alleges a class-based discriminatory animus behind Defendants' actions. While Defendants argue they were not motivated by animus, but by a concern for M.A.F.'s well-being, the only question is whether Freyre's allegations are sufficient to state a claim under § 1985(3). Freyre has alleged "assertedly benign (though objectively invidious) discrimination" against parents with disabilities resulting in the separation of her family, which is sufficient to state a claim. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993).[11]

Defendants further argue that the animus Freyre alleges is directed not at the disabled as a class, but only at physically handicapped parents who are unable to care for their children. Defendants' attempt to narrow Freyre's claim is unavailing. As a disabled parent, Freyre states a claim when she alleges a conspiracy by state actors to deny her custody, visitation, and reunification

---

[11] This determination should not be construed as a comment on the merits of Freyre's claim.

with her child based solely on her disability. *See Fitzpatrick v. Town of Falmouth*, 321 F. Supp. 119, 124 (D. Me. 2004) (allegations of conspiracy between school administrators and town to deny autistic home-schooled child access to public school playground sufficient to overcome motion to dismiss).

Finally, a § 1985(3) conspiracy must be "aimed at" depriving the plaintiff of a protected right. *Bray*, 506 U.S. at 275. Freyre adequately alleges the conspiracy was aimed at depriving her of custody of M.A.F., a right protected by the Constitution. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

### C.   42 U.S.C. § 1983

The final claims brought by Freyre are based on 42 U.S.C. § 1983 against HKI (Count VIII) and Sheriff David Gee (Count IX). Generally, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

HKI's arguments as to Count VII echo those made and partially rejected in the previous order on the first motion to dismiss. (*See* Dkt. 68 at 2). The claim based on policy and custom will not be dismissed, but as before, to the extent that Plaintiff's § 1983 claim is still based on the actions of individuals (Dkt. 71 ¶ 206(i-ii)), it is due to be dismissed with prejudice.

Sheriff Gee challenges Count IX on two grounds. First, Sheriff Gee argues that Freyre has failed to adequately allege a causal connection between his actions and her injuries. The Second Amended Complaint, however, sufficiently alleges that the policies and customs of Gee's office encouraged the separation of parents with disabilities from their children, including the separation of Freyre and M.A.F. (*Id.* ¶¶ 220-227). Second, Sheriff Gee contends that Freyre's

constitutional rights were not violated by the relevant policies and customs, because M.A.F.'s removal was justified. This argument, which depends on balancing the interests of the state and parents regarding M.A.F.'s well-being, is better suited for a later stage of the proceedings. *See Kearney*, 329 F.3d at 1298-99. Freyre's allegations that Sheriff Gee violated her "constitutionally protected liberty interest in the care, custody, and management" of her child, *id.* at 1293, are sufficient to overcome the motion to dismiss.

Accordingly,

1) The motions to dismiss by Jessica Pietrzak (Dkt. 73), Iris C. Valdez-Corey (Dkt. 74), Sheriff David Gee in his official capacity as Sheriff of Hillsborough County (Dkt. 75), the State of Florida (Dkt. 76), and Julie Emerson (Dkt. 77) are **DENIED**.

2) The motion to dismiss by Alexa Argerious, Angeline Attila, Jill Adams, and Tiffany Short (Dkt. 78) is **GRANTED** as to Attila and **DENIED** as to the other Defendants. The claims against Attila are **DISMISSED with prejudice.**[12]

3) The motion to dismiss by HKI (Dkt. 72) is **GRANTED** to the extent Count VIII is based on individual actions, and otherwise **DENIED**.

4) The remaining Defendants shall answer the Second Amended Complaint within fourteen (14) days of this Order.

**DONE AND ORDERED** this _4_ day of December, 2014.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

---

[12] Dismissal with prejudice is appropriate on an unsuccessful third attempt to plead the same cause of action. *See Hasbun v. Recontrust Co., N.A.*, 508 Fed. Appx. 941, 942 (11th Cir. 2013); *Nettles v. City of Leesburg-Police Dep't*, 415 Fed. Appx. 116 (11th Cir. 2010); *Anderson v. Vanguard Car Rental USA, Inc.*, 304 Fed. Appx. 830 (11th Cir. 2008).