# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DORIS FREYRE,**

> **Plaintiff,**

**vs.**                                                          **Case No. 8:13-cv-2873-T-27TBM**

**SHERIFF DAVID GEE, as Sheriff of the
Hillsborough County Sheriff's Office,**

> **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is Hillsborough County Sheriff David Gee's Motion for Summary

Judgment (Dkt. 189), and Plaintiff's opposition (Dkt. 202).[1] Plaintiff Doris Freyre, a single, disabled

mother, filed this lawsuit after MAF, her 14 year old disabled daughter, was removed from her

custody by a Child Protective Investigator based on allegations of physical and verbal abuse and

medical neglect. MAF was temporarily sheltered at Tampa General Hospital ("TGH"), and

eventually transported to a skilled nursing facility in Miami, where she died.[2] Plaintiff sues

---

[1] Summary judgment was granted in favor of Defendants Iris Valdez-Corey and Jessica Pietrzak, both of whom are Child Protective Investigators ("CPI"), on Count VII, which alleged a § 1985 conspiracy. (Dkt. 247). The undisputed material facts summarized in that Order (Dkt. 247) are incorporated by reference.

[2] The Child Protective Investigator removed MAF after a Child Protective Team staffing meeting, during which concerns about MAF's safety and well-being were discussed:

> The concern is two fold. Based on the lengthy history of the mother's lack of involvement and concern for the child's care and her claimed back injury, there is a great concern for the child's safety and well-being when the home health care nurses are not in the home. Based on the mother's past actions, the child would be in imminent risk of harm through neglect if left in the mother's care. Most recently, while the child was in the ER on 3/16/11, the ER doctor gave orders to administer a medication that the mother knew the child was allergic to and the mother just sat there and did not inform the doctor of the child's allergy. After the mother did not inform the doctor, the home health nurse had to do so . . . . There have already been documented incidents of physical and verbal abuse by the mother . . .

1

Hillsborough County Sheriff David Gee ("HCSO") for violating the Americans with Disability Act ("ADA") (Count II), violating the Rehabilitation Act (Count V), and under 42 U.S.C. § 1983 (Count IX). Upon careful consideration, HCSO's Motion (Dkt. 189) is GRANTED in part.

## I. Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)). On the other hand, "[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *See Lima v. Fla. Dep't of*

---

including hitting the child and yelling threats at the child that the mother would place her in a nursing home and no one would ever come and visit her. . . . Based on the continued opportunity for assistance, continued failure to follow through with appointments, continued lack of concern and involvement regarding the child's medical issues, and failure to take the child to the ER when she had a 103.5 fever until the home health nurse made the mother call the ambulance, I gave PC on the basis of prospective neglect.

(Dkt. 189-9 at 5).

*Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015)(quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994)).

Finally, to the extent that either parties' arguments in their papers are unclear or not fully developed, this court is not required to "search the record and construct every argument that could have been made based upon the proffered materials." *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 n.5 (11th Cir. 1995) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995)).

## II. Discussion

### A. Count II - Violation of the ADA

#### i. Standing

The HCSO argues that Plaintiff lacks individual standing to bring an ADA claim because the alleged discrimination is not traceable to the HCSO's conduct and was not based solely on her disability. Plaintiff counters that she was discriminated against due to her disability when MAF did not receive in-home services, when Plaintiff was not afforded an equal opportunity to participate in the dependency process, and when MAF was transferred to Miami over her objection and without a hearing. She therefore contends that she has demonstrated individual standing.

Standing must be addressed before the merits of the claim are addressed. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006). To demonstrate standing, Plaintiff must show that she suffered a concrete injury, the injury is fairly traceable to HCSO, and that a favorable judgment will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61(1992). Traceability requires "something less than the concept of 'proximate cause.'" *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)(citation omitted). And "even harms that flow indirectly from the action in question can be said to be 'fairly

traceable' to that action for standing purposes." *Id.* (citation omitted).

### Individual Standing

The ADA protects persons with disabilities from being denied benefits because of their disability.[3] *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1081 (11th Cir. 2007). There is no dispute that Plaintiff is disabled and that the ADA applies to the HCSO. Plaintiff's individual ADA claim originates from the removal of MAF from her home. Defendant contends that "the undisputed facts clearly show that Plaintiff's inability to care for MAF was only part of the reason" for MAF's removal from her custody. (Dkt. 189 at 13). That is essentially a concession that part of the reason MAF was removed from Plaintiff's home was due to Plaintiff's disability. As noted, standing does not require proximate causation. *See Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 148 F.3d 1231, 1257 (11th Cir. 1998)(no authority even remotely suggests that proximate causation applies to the doctrine of standing). Plaintiff has demonstrated individual standing.

### Associational Standing

A person has associational standing under the ADA if "they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135, 1143 (11th Cir. 2014). It is undisputed that MAF was disabled and required twenty-four hour care.

Both parties blend their arguments on individual and associational standing, making it difficult to parse out Plaintiff's associational standing contention. Nonetheless, Plaintiff, although herself disabled, has standing if she was "personally excluded, personally denied benefits, or personally discriminated against because of [her] association with [MAF]." *McCullum*, 768 F.3d at

---

[3] The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C § 12132.

1143; *see* 42 U.S.C. § 12182(b)(1)(E).

After MAF was removed from Plaintiff's home, a Florida Circuit Judge conducted a shelter hearing. The Shelter Order confirmed that there was probable cause to remove MAF from Plaintiff's home, authorized her placement in shelter care, and authorized DCF to provide any emergency and ordinary medical treatment for MAF, but directed that before exercising those rights, the legal custodian was to "make every effort to notify the parents and obtain consent" for the treatment. (Dkt. 189-12). The Shelter Order further provided that "[i]f the parents, after being informed, refuse to provide consent, the Department shall schedule a hearing with the court." (Shelter Order ¶ 7, Dkt. 189-12). The judge scheduled a status hearing for April 14, 2011.

Although notified of MAF's pending transfer from TGH to the skilled nursing facility in Miami, Plaintiff did not consent to the transfer. And a hearing was not conducted before MAF was transferred. Plaintiff counters that HCSO failed to allow her an equal opportunity to participate in the dependency process because of her disability. Plaintiff, because of her association with MAF, was therefore denied the opportunity to be heard before MAF was transferred. That is sufficient to confer associational standing for her ADA claim.

Having demonstrated standing, to prevail on her ADA claim, Plaintiff must prove to a jury's satisfaction that the HCSO violated her rights under the ADA because of her disability, or because of her association with MAF. *McCullum*, 768 F.3d at 1146–47; *Bircoll*, 480 F.3d at 1081. And to prevail on her claim for compensatory damages, she must show that HCSO acted with discriminatory intent. *McCullum*, 768 F.3d at 1146–47. Discriminatory intent may be shown through evidence that HCSO acted with deliberate indifference to her statutory rights. *Id.* at 1147. Deliberate indifference is established when a defendant "*knew* that harm to a federally protected right was substantially likely and *failed* to act on that likelihood." *Id.* (internal quotation marks and citations

omitted)(emphasis in original).

### ii. Plaintiff's Individual Claim

As noted, it is undisputed that MAF was totally dependent on her care providers and required twenty-four hour care. Likewise, it is undisputed that Plaintiff could not meet all of MAF's needs without additional services, as Judge Corvo determined during the shelter hearing and memorialized in the Shelter Order. Plaintiff's individual ADA claims appear,[4] therefore, to be that her ADA rights were violated because (1) she was denied the opportunity to participate in MAF's dependency process, (2) she was not provided a reasonable accommodation to enable her to have MAF returned to her home or placed in nearby shelter care, and (3) the HCSO failed to provide MAF with the least restrictive alternatives, which would have enabled Plaintiff to exercise her visitation rights.

### *Opportunity to Participate*

To the extent Plaintiff contends that she was denied an opportunity to participate in the dependency process because of her disability, the undisputed evidence demonstrates to the contrary. The record demonstrates that she was actively involved in the dependency process. When MAF was removed on March 29, 2011, she was notified of the Shelter Hearing. She attended the Shelter Hearing and was represented by counsel. Pietrzak contacted her on April 6, 2011 and again on April 8, 2011. (Dkt. 189-2 at 63, 72). Pietrzak attempted to meet with her the following week, but she "would not give a date or time." (Dkt. 189-2 at 63). And Pietrzak spoke with her again on April 11, 2011 and April 12, 2011. (Dkt. 189-2 at 57, 58). On April 12, 2011, Pietrzak documented that Plaintiff "does not want to talk with CPI any longer." (Dkt. 189-2 at 56).

After the Shelter hearing, Pietrzak and Valdez-Corey worked with HKI and other agencies,

---

[4] Plaintiff inextricably blends her arguments and contentions as to how her individual rights as a disabled person were violated and how she was excluded, denied benefits, or discriminated against because of her association with MAF.

including Maxim and the Opportunity Home Health Care Services ("OHS"), in an attempt to secure either in-home services for MAF or local placement. (Dkt. 189-2 at 52, 54, 60, 63-65, 71; Carstens Dep. 49:4-24, Dkt. 189-13; Dkt. 189-4; Dkt. 189-24; Dkt. 189-29; Dkt. 189-43). Ultimately, however, it was learned that Medicaid would not authorize twenty-four hour coverage and Maxim informed that it was no longer willing to provide the services because of difficulties it had with Plaintiff. And HKI's funding would not meet the requirements of in home service between midnight and 7:00 a.m., as required by the Shelter Order as a condition to returning MAF to the home. (Carstens Note, Apr. 11, 2011, Dkt. 189-2).

On April 11, 2011, the Children's Multidisciplinary Assessment Team informed the Agency for Persons with Disabilities ("APD") that it had determined that MAF would require a "skilled" level of care at a nursing facility for one year, unless there was a significant change. (Dkt. 189-14). And, APD determined that its specialized services would not be needed because of the need for "skilled" care. (Dkt. 189-2 at 59). After receiving these assessments, HKI began searching for a skilled nursing facility for MAF's placement. Nurse Emerson provided Pietrzak with a list of skilled nursing facilities in Florida that would accept Medicaid pediatric patients.

When it became clear that in-home services and local placement could not be secured, Pietrzak executed a Petition for Adjudication for Dependency prepared by the Attorney General's Office, based on allegations of medical neglect, prospective neglect and physical abuse of MAF. That day, Pietrzak spoke with Carstens about enrolling MAF in Prescribed Pediatric Extended Care ("PPEC") as a solution. However, PPEC advised that MAF would not qualify for PPEC if she was able to attend school. (Dkt. 189-2 at 52).

As a result of the Petition for Dependency, the status conference scheduled for April 14, 2011 was converted to an arraignment before Circuit Judge Emily Peacock. (Dkt. 189-18). Before the

hearing, Carstens spoke with Plaintiff about the PPEC, who informed her that MAF was enrolled in Hillsborough County Public School's Homebound Program. Based on what Carstens had been told by PPEC, MAF would not qualify for placement at PPEC.

Plaintiff was present during the hearing before Judge Peacock and represented by counsel. Plaintiff was notified that the hearing would be converted from a status to an arraignment. (Dkt. 189-19). An Assistant Attorney General advised Judge Peacock that HKI was unable to obtain in home care because of Medicaid's refusal to pay for the 24 hour care and Maxim's refusal to work with Plaintiff.[5] The Assistant Attorney General advised the Judge that PPEC had been looked into as an option, but that Plaintiff did not want to place MAF in a child care facility because of her immune deficiency disorder.[6]

During the hearing, Plaintiff's counsel argued that MAF should be returned to Plaintiff's home, without twenty-four hour in-home care. (*Id.*). In response, Judge Peacock suggested that a motion to modify placement be filed. (*Id.*). No such motion was filed by the attorney, however. Judge Peacock did not enter any orders, and MAF remained at TGH. (Dkt. 189-18).

Ultimately, since long term funding for in home services and local placements were unavailable, Valdez-Corey consented to MAF's transfer from TGH to Florida Club Care Center

---

[5] Medicaid would not provide twenty-four hour in-home services. (Dkt. 189-5 at 15; Dkt. 189-13 32:8-17; Dkt. 189-2 at 58-59; Dkt. 189-43).

[6] Although Plaintiff argues that HCSO failed to timely serve her with the dependency petition, her counsel did not object to service and entered a denial during the hearing. (Dkt. 189-19). Plaintiff also complains that several misrepresentations were made to Judge Peacock during the hearing by the Assistant Attorney General, the most serious of which was that MAF was at that time in a nursing home, whereas she was at TGH (Dkt. 202 at 11). Any alleged misstatements are not material, however, since Judge Peacock entered no orders based on those statements and the Shelter order was not modified. Further, her claim that HCSO misrepresented the availability of in-home services and MAF's status is wholly unsupported by the record evidence, although AAG Attila incorrectly represented MAF's status. (Dkt. 189-19). And while Plaintiff is critical of Pietrzak for not correcting the alleged misrepresentations, in the context of a judicial hearing, she fails to demonstrate that Judge Peacock would have considered anything other than what the attorneys represented to her. Plaintiff's "but for" scenario about what the judge may have ordered is nothing but speculation.

("FCCC"), the skilled nursing facility in Miami, and Pietrzak signed the admission agreement. (Dkt. 189-40 at 12; Dkt. 189-41). Plaintiff was told about the transfer and placement but would not consent. MAF was transferred to FCCC without a hearing on April 26, 2011. Notwithstanding that Plaintiff objected to the transfer, and a hearing was not held as required by the Shelter Order, the undisputed evidence contradicts Plaintiff's unsupported contention that the hearing was not held due to her disability.[7] And Plaintiff has not shown a material factual dispute about the reasons for MAF's transfer. *See Lima*, 627 F. App'x at 785–86 ("[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted."). Accordingly, the HCSO's motion is due to be granted on this claimed violation of the ADA.

### *Reasonable Accommodation*

Under the ADA, a plaintiff can proceed on a theory of failure to make reasonable accommodations. *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009)(citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n. 6 (11th Cir.2008)). "[T]o establish a Title II violation under a reasonable accommodation theory . . . a plaintiff must show (1) she is a qualified individual with a disability, (2) she is unable, because of her disability, to meaningfully access a public *benefit to which she is entitled*, and (3) the public entity failed, *despite her request*, to provide a reasonable accommodation for her disability." *See Todd v. Carstarphen*, No. 1:16-CV-3729-WSD, 2017 WL 655756, at *10 (N.D. Ga. Feb. 17, 2017) (citing *see Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *5 (11th Cir. Aug. 24, 2007)).(emphasis added).[8] And the "duty to provide a reasonable

---

[7] Plaintiff filed a *pro se* motion requesting a hearing on the transfer. (Dkt. 202-5). Apparently, that motion was never scheduled for hearing.

[8] In *Todd*, a similar theory was pursued, unsuccessfully. There, the plaintiff, a blind mother, sought preliminary and permanent injunctive relief requiring the defendants to transport her children to and from school. 2017 WL 6555756 at *2. She alleged that the public school and its superintendent denied her a reasonable accommodation for her disability

accommodation is not triggered unless a specific demand for an accommodation has been made."[9]

*Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).

Plaintiff's contention that she was denied a reasonable accommodation under the ADA is hardly a model of clarity. In her Second Amended Complaint, Plaintiff alleges:

> HSCO discriminated against Plaintiff by denying her medically necessary services in the community as a reasonable accommodation, resulting in Plaintiff's daughter being unnecessarily institutionalized and subsequent death.

(Dkt. 71 at ¶ 122).

This ADA claim fails, based on the undisputed facts. The only conceivable "medically necessary services" relevant to this dispute are the in-home services required by the Shelter Order, and the alternative twenty-four hour care and local placement, all of which were benefits to which MAF was entitled, not Plaintiff. The HCSO could not have denied Plaintiff a reasonable accommodation for her disability by failing to provide a benefit that she herself was not entitled to.

Plaintiff's discussion of her accommodation claim is relegated to two paragraphs in her response to Defendant's summary judgment motion, which fail to explain what accommodation she was entitled to that the HCSO failed to provide *her*. (Dkt. 202 at 31). And she cites no authority supporting such a claim. And Plaintiff seems to conflate the requirements of the Shelter Order, which were imposed for the benefit of MAF, with her right to an accommodation under the ADA. On the other hand, if she is contending that either twenty-four hour services and local placement for MAF was a reasonable accommodation for herself, the same analysis applies. Those services were for

---

by failing to provide transportation for her children. *Id.* at *10. In finding that the plaintiff was not entitled to a reasonable accommodation for a benefit that she was not entitled to, the court reasoned that the benefit the plaintiff sought, public education, was a benefit provided to students, not parents of the students. *Id.* at *12.

[9] At least one district court has stated a plaintiff need not request an accommodation if the need for one was obvious. *Schwarz v. The Villages Charter Sch., Inc.*, 165 F. Supp. 3d 1153, 1173 (M.D. Fla. 2016), aff'd sub nom. *Schwarz, et. al.*, v. *Board of Supervisors, on behalf of the Villages Cmty. Dev. Districts, et al.*, No. 16-11122, 2017 WL 104460 (11th Cir. Jan. 11, 2017).

MAF, not Plaintiff.

MAF was removed because of allegations of medical neglect and abuse by Plaintiff. MAF was totally dependent on others for all of her needs, and required twenty-four care. (Dkts. 189-9, 189-10, 189-11, 189-12). Plaintiff fails to explain how the alleged failure to provide in-home services, twenty-four hour care, or local placement to MAF constitutes a failure to accommodate *her*.

Even if Plaintiff raises an arguable claim of failure to accommodate, the undisputed evidence demonstrates that the HCSO did not "deny" in-home services to MAF or twenty-four hour service in a local placement.

First, it was not the responsibility of the HCSO to provide those services. The HKI-HCSO Working Agreement provides that the CPI Division is responsible for investigating allegations and that HKI provides protective services and foster care services. (Working Agreement Art. I, Dkt. 189-47). It further provides that when a child has been admitted to a hospital, the CPI Division will contact placement services at HKI when the child is ready for discharge. (Working Agreement Art. IV § 4.11, Dkt. 189-47).

Even if, under the Working Agreement, the HCSO assumed responsibility to provide services to MAF until after the ESI staffing on April 12, Pietrzak directed HKI to look for in-home services for MAF's care. (Carstens Note, Apr. 5, 2011, Dkt. 191-2 at 73)("staffed case with CPI Pietrzak. She advised that this RS should resume to work towards locating a home health care provider to place in the home"). Those efforts were, however, unsuccessful, through no fault of the HCSO. Maxim was no longer willing to provide services "due to the past difficulty with working with the mother," as Maxim's home health nurse had asked to be removed from the case (Carstens Note, Apr. 8, 2011, Dkt. 191-2 at 63-65). And although OHS initially indicated it could provide the midnight to seven a.m. services, it expressed the need to review the "contract," but did not thereafter

indicate a willingness to take the case. (Carstens Dep. 49:4-10, Dkt. 189-3; Carstens Note, Apr. 6, 2011, Dkt. 189-2 at 71). And, as noted, Medicaid would not authorize twenty-four hour coverage. (Dkt. 189-2).

Finally, if HKI paid for three weeks of twenty-four hour services, additional funding would have been unavailable after its funds were exhausted. (Carstens Note, Apr. 11, 2011, Dkt. 189-2). And there is no evidence that HCSO was required to pay for in-home health care for MAF or that HCSO could require HKI to pay for three weeks of service. (HKI-HCSO Working Agreement Art. I, Art. IV Sec. 4.11, Dkt. 189-47). Indeed, HKI "was responsible for procuring and paying for all goods, services, and placements." (Morris Aff. ¶ 8, Dkt. 189-45). Pietrzak also inquired about placing MAF in a PPEC or group home. (Carstens Notes, Apr. 13, 2011, Dkt. 191-2 at 54; Pietrzak Notes, Apr. 11, 2011, Dkt. 191-2 at 60). However, MAF did not qualify for a PPEC and could not be accepted in a group home because of lack of funding, specifically a Cost Plan Freeze. (Dkt. 189-2 at 52; Dkt. 189-24; Dkt. 189-29). And because of her needs, MAF was not appropriate for placement in a traditional foster care setting. (Dkt. 189-29).

The question is not, as Plaintiff seemingly urges, whether Pietrzak and Valdez-Corey should have done more, but rather whether their efforts were reasonable. In an unrelated context, it has been held that Title II "does not require States to employ any and all means" to accommodate a disabled individual:

> Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs. It requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service.

*Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004).

In sum, the undisputed evidence demonstrates that Pietrzak and Valdez-Corey's efforts were reasonable, that is, within "within the limits of practicability." *Id.* at 532. It follows that the HCSO never "denied" services to MAF, and therefore never denied Plaintiff a reasonable accommodation.

Moreover, the undisputed evidence demonstrates that Plaintiff never made a specific request that the HCSO provide her with a reasonable accommodation for her disability. Plaintiff's unsupported argument that the Shelter Order "was tantamount to a request for modification" is wholly unpersuasive, and without legal support. (Dkt. 202 at 31). The Shelter Order imposed conditions on the return of MAF to Plaintiff's home. Again, those services were intended for MAF, not Plaintiff. No reasonable jury could return a verdict in favor of Plaintiff, as there is no genuine issue of material fact. *See Lima,* 627 F. App'x at 785–86. Summary judgment in favor of the HCSO is therefore due to be granted on this alleged ADA violation.

### Failure to Provide Less Restrictive Alternatives
### (Services in the Most Integrated Setting)

In her Second Amended Complaint, Plaintiff alleges:

HSCO have [sic] discriminated against the Plaintiff in violation of the ADA
on the basis of her disability by:

> a. Segregating M.A.F. and failing to provide her with appropriate community based services;
>
> b. Denying Plaintiff and M.A.F. medically necessary services resulting in the M.A.F.'s [sic] institutionalization and subsequent death; [and]
>
> c. Denying the Plaintiff and M.A.F. access to existing community programs and by requiring M.A.F. to be confined in segregated institutional settings in order to receive the care she required;"

(Dkt. 71 at ¶ 125).

To the extent Plaintiff alleges and contends that the HCSO failed to provide her (or MAF) services in the most integrated setting appropriate to her needs, this claim fails essentially for the

same reasons her accommodation claim fails. This claim is based on securing local placement alternatives for MAF.[10] But as noted, MAF had to qualify for alternative local placements because she required twenty-four hour care, and the undisputed facts demonstrate that in-home services and local placement alternatives were not available. Moreover, the ultimate decision maker for MAF was the Judge, who directed sheltering of MAF. In any event, because this claim is based on services intended for MAF, not Plaintiff, summary judgment is due to be granted.

In sum, summary judgment on all of Plaintiff's individual ADA claims is due to be granted.

### iii. Plaintiff's Associational Claim

Although the undisputed evidence does not support Plaintiff's individual ADA claims that the HCSO discriminated against her due to her disability, she has proffered evidence to raise a question of material fact on her associational claim that MAF was unjustifiably institutionalized in the Miami facility.

Unjustified institutional isolation of persons with disabilities can be a form of discrimination. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).[11] And while *Olmstead* recognizes that a state may generally rely on the reasonable assessments of professionals, where, as here, the affected person (Plaintiff), objects to the institutional placement, and a court has specified that a hearing must be held on the objection, a reasonable jury could find that Plaintiff was personally discriminated against by virtue of her association with MAF. 42 U.S.C. § 12182(b)(1)(E);

---

[10] Plaintiff never identifies what services she individually required. To the extent Plaintiff argues in her response that "the affected person did oppose the [transfer to a skilled nursing facility in Miami]" (Dkt. 202 at 32), that argument may be pertinent to her associational standing to raise, but nothing to do with her individual ADA claim. In any event, Plaintiff did not proffer evidence that her disability prevented her from visiting MAF in Miami. Rather, she merely had transportation issues. (Dkt. 189-2 at 2, 33).

[11] "[U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607.

*McCullum,* 768 F.3d at 1142 ("It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.").

The Shelter Order required a court hearing if Plaintiff withheld consent for medical treatment. (Dkt. 189-12). And placement in a skilled nursing facility necessarily constitutes medical treatment, since MAF required twenty four hour care.[12] MAF was originally scheduled to be transferred to Miami on Monday, April 25, 2011. On Friday, April 22 at about 3:00 p.m., CPI Valdez-Corey asked the Attorney General Office 's attorneys ("OAG") if MAF could be moved. (Dkt. 189-9). The move was delayed until Tuesday, April 26, 2011, for either a court hearing or to "address the case appropriately." (Adams Email forwarded to Valdez-Corey, Apr. 22, 2011, Dkt. 189-35 at 7).

At 3:30 p.m., AAG Adams advised that "Iris is going to contact the mother to tell her that the only possible placement is across the state and to contact her attorney if she has a problem ." (Adams Email, Apr. 22, 2011, Dkt. 189-35 at 7). At 3:52 p.m., Valdez-Corey spoke with Plaintiff who objected to the move, complained she would not be able to see her daughter in Miami, and complained of discrimination. (Dkt. 189-2 at 33). Valdez-Corey advised Plaintiff to speak with her attorney. (Valdez-Corey Dep. 53:12-55:6, Dkt. 189-32). At 4:38 p.m., MAF's grandfather called Valdez-Corey, requested a hearing on Monday regarding the move, and asserted that they were going to fight the move. (Valdez-Corey Dep. 57:7-25, Dkt. 189-32). At 5:01 p.m., Valdez-Corey emailed Pietrzak advising her to "be prepared for potential court hearing" regarding MAF's placement. (Dkt.

---

[12] Defendant contends that a hearing was not required before MAF was transferred. Although the Shelter Order provides that "[t]he Department of Children and Families shall have placement and care responsibility while the child is under protective supervision in an out-of-home placement," I nonetheless construe the Order to require a hearing in the circumstances of this case.

189-2 at 29). At about the same time, OAG learned from HCSO that Plaintiff objected to the placement. (Dkt. 189-33 at 84).

At 11:49 a.m. on Monday, April 25, 2011, Plaintiff's *pro se* Petition Requesting Urgent Emergency Hearing was filed. (Dkt. 202-5). The Petition was hand delivered to the OAG the same day. (Freyre Dep. 136:13-19, Dkt. 191-39). At 1:43 p.m., Valdez-Corey spoke to Plaintiff, learned that Plaintiff had not heard from her attorney, and was told that Plaintiff believed MAF could not be moved under the Shelter Order. (Dkt. 189-2 at 26). Two minutes later, at 1:45 p.m., AAG Short told Pietrzak that a hearing was not necessary and that Plaintiff's attorney had not filed any motions. (Dkt. 189-2 at 26).

MAF was moved from TGH because Pietrzak and Valdez-Corey consented, since Pietrzak signed the admission papers to Florida Club Care Center and Valdez-Corey gave verbal consent for MAF's discharge.[13] (Dkts. 189-40 at 12; 189-41).

Valdez-Corey knew that Plaintiff objected to the transfer and had complained of discrimination and that she would be unable to visit MAF in Miami. (Dkt. 189-2 at 33). She also knew that Plaintiff had not heard from her attorney. (Dkt. 189-32 57:7-25; Dkt. 189-2 at 29). Despite this, and notwithstanding the clear language in the Shelter Order granting Plaintiff unsupervised visitation with MAF and requiring a hearing if she objected to medical treatment, Pietrzak and Valdez-Corey consented to the admission and transfer to Miami, without a hearing. A reasonable jury could therefore find that this decision violated MAF's rights as a disabled dependent in the care

---

[13] Pietrzak authorized FCCC to conduct a comprehensive assessment of MAF and "administer necessary nursing procedures, pediatric procedures, skin scrapping, non-surgical dental procedures, and laboratory and x-ray procedures[.]" (Dkt. 189-41 at 5).

of the State, as well as Plaintiff's associational rights.[14] A genuine issue of material fact therefore exists as to whether HCSO acted with deliberate indifference when it consented to MAF's transfer without a hearing, precluding summary judgment in favor of the HCSO on this claim.[15] *See McCullum*, 768 F.3d 1135, 1143 (11th Cir. 2014); 42 U.S.C. § 12182(b)(1)(E).

### B. Count V - Rehabilitation Act

The HCSO contends that the Rehabilitation Act does not apply to its CPI Division because the CPI does not receive federal funds. (Dkt. 189 at 18 n. 5, 24). Plaintiff does not rebut the HCSO's contention that "the State of Florida is the sole source of all funding to Defendant for the performance of these state functions." (Bullara Aff. ¶ 4, Dkt. 189-56).[16] It is therefore undisputed on this record that the HCSO, including its CPI Division, does not receive federal funding.

The Rehabilitation Act makes it unlawful for any programs receiving federal assistance to discriminate on the basis of disability. 29 U.S.C. § 794. "Programs" include all operations, departments, agencies, or other instrumentalities of a State and covers "in the case of federal assistance to a State or local government, the State or local government that distributes the assistance and each department or agency that receives it." *See McMullen v. Wakulla Cty. Bd. of Cty. Commissioners*, 650 F. App'x 703, 706 (11th Cir. 2016).

A sheriff is a county officer whose budget is funded entirely by county taxes. Fla. Const. art.

---

[14] It is undisputed that the attending physician recommended skilled nursing home placement and the Assistant AGS opined that a hearing was not required, and Pietrzak and Valdez-Corey relied on those opinions in consenting to the transfer. Whether their reliance on "others to fulfill their legal responsibilities and contractual obligations" and "the guidance of the medical professionals and OAG before making any determinations or taking any actions" negates Plaintiff's claim of deliberate indifference is for the jury to consider.

[15] To the extent Plaintiff argues that the transport without her consent constitutes a violation of the ADA, that argument is unsupported. Plaintiff's right to be the sole decision maker for MAF's healthcare had been removed by court order.

[16] Indeed, whether the HCSO receives federal funding is the subject of a motion in limine and motion to quash service of process. (Dkts. 228, 244). Nonetheless, HCSO raised the issue, albeit in a footnote, and Plaintiff did not proffer any evidence in rebuttal *in her response*.

VIII, § 1(d); Fla. Stat. § 30.49 (d); *Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1310 (11th Cir. 2005). The Grant Agreement between the HCSO and the Florida Department of Children and Families ("DCF") provides that "the State of Florida is the sole source of all funding" for the CPI Division. (Grant Agreement ¶ L.3., Dkt. 202-10). Since Plaintiff proffers no evidence that the HCSO or its CPI Division receives any federal funding, summary judgment is due to be granted on Count V. 29 U.S.C. § 794; *McMullen*, 650 F. App'x at 706.

### C. Count IX - 42 U.S.C. § 1983

In Count IX, Plaintiff asserts a § 1983 claim, alleging HCSO had a practice of denying persons with disabilities custody of their children. (Dkt. 71 at 57). "To attribute liability to a municipality under § 1983, the plaintiff must demonstrate that the municipality had an official policy that was 'the moving force of the constitutional violation.'" *Vineyard v. Cty. of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993). (citation omitted).

As HCSO accurately contends, "there is a lack of record evidence to demonstrate any policy or custom of Defendant leading to the violation of disabled parents' civil rights[.]" (Dkt. 189 at 20). Instead of rebutting HCSO's argument, Plaintiff contends that Valdez-Corey, individually, had a practice of placing children with medical needs in nursing homes and HCSO did not provide training regarding services available to these children or compliance with the ADA. (Dkt. 202 at 26, 34). But she does not show how this is a violation of her individual rights.[17] And, as noted, any rights that Plaintiff had to make healthcare decisions on behalf of MAF were removed by the Shelter Order.

---

[17] Notwithstanding, MAF was removed with probable cause, and a hearing was held within twenty-four hours, in accordance with statutory requirements. *See Doe v. Kearney*, 329 F.3d 1286, 1293 (11th Cir. 2003)(a state may remove children threatened with harm when it is justified). A Florida Circuit Judge determined that MAF was properly removed from Plaintiff's custody, placed MAF in shelter custody, and imposed conditions required before MAF was returned to Plaintiff's home. *See id.* Plaintiff does not demonstrate how she individually has standing to bring this claim. Claims for unnecessary institutionalization are brought by individual patients. *See e.g. Olmstead, supra* (ADA and § 1983 claims brought individually by institutionalized patients).

Because Plaintiff does not proffer any evidence or argument that HCSO, as opposed to Valdez-Corey individually, has a practice of denying disabled persons custody of their children, HCSO's motion for summary judgment on Plaintiff's § 1983 claim is due to be granted.[18]

### D. Eleventh Amendment Immunity

HCSO asserts that Eleventh Amendment immunity bars Plaintiff's remaining ADA claim in Count II. Plaintiff contends that HCSO is an "independent contractor" when performing child protective investigations and is therefore not entitled to immunity under the Eleventh Amendment.

In determining whether a government official is an arm of the state for purposes of Eleventh Amendment immunity, "we 'ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.'" *Stanley v. Israel*, 843 F.3d 920, 924 (11th Cir. 2016) (quoting *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)). Although the Eleventh Circuit has repeatedly held "that Florida's sheriffs are not arms of the state" in various contexts and therefore are not entitled to Eleventh Amendment immunity, the analysis is dependent on the relevant function the sheriff is performing. *Abusaid*, 405 F.3d at 1303.

The relevant question is whether HCSO acted as an arm of the state while sheltering MAF. *Abusaid*, 405 F.3d at 1304. The four factors considered in determining whether a defendant "while engaged in the relevant function" is acting as an arm of the state are: 1) how state law defines the entity; 2) the degree of control the state maintains over the entity; 3) the source of its funding; and 4) who is financially responsible for judgments. *Stanley*, 843 F.3d at 924; *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003).

---

[18] Although not raised, this claim is also subsumed within her individual ADA claim. *See Badillo v. Thorpe*, 158 F. App'x 208, 213 (11th Cir. 2005)("a plaintiff cannot maintain a section 1983 action in lieu of—or in addition to —a Rehabilitation Act or ADA cause of action if the only alleged deprivation is the [plaintiff's] rights created by the Rehabilitation Act and the ADA")(quoting *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1531 (11th Cir. 1997)(alteration in original).

### *Florida Law*

Sheriffs are "county officers" and can be abolished by the county if the duties are transferred to another office. Fla. Const. art. VIII, § 1(d). "This definition 'weighs heavily against assigning arm of the state status to a Florida sheriff.'" *Stanley*, 843 F.3d at 926 (quoting *Abusaid*, 405 F.3d at 1305).

State law provides that DCF is authorized to enter into grant agreements with sheriffs pursuant to Florida law, but it is not required to. Fla. Stat. § 39.3065(3)(a). And there are no statutes requiring a sheriff to enter into a grant agreement with DCF. *See e.g.* Fla. Stat. § 30.15 (describing the powers, duties and obligations of sheriffs). Florida law preserves the independence of sheriffs concerning purchases of supplies and equipment, selecting personnel, hiring and firing of personnel, and setting personnel's salaries. Fla. Stat. § 30.53.

While state law defines DCF as an agency of the State, the Grant Agreement between the HCSO and DCF expressly provides that HCSO "act[s] in the capacity of an independent contractor while performing child protective services." (Dkt. 202-10). And Major Robert Bullara avers that the CPI Division within HCSO "acts in the capacity of an independent contractor." (Bullara Aff. ¶ 6, Dkt. 189-56). Accordingly, this factor weighs heavily against finding arm of the state status.

### *Degree of Control*

Although the Grant Agreement provides that "the [S]tate maintain[s] substantial control over the performance of this grant," in addition to providing that HCSO is an independent contractor, the agreement limits the scope of HCSO's performance as an agent of the State to "the sole and limited purpose of receiving information" regarding applicants and recipients of public assistance programs. (Dkt. 202-10 at 10). While the authority to conduct a child protective investigation is derived from Chapter 39 of the Florida Statutes, "Eleventh Amendment immunity has never been held to apply simply because an independent contractor performs some government function." *Rosario v. Am.*

*Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1047 (11th Cir. 2007).

Further, Attachment I to the Grant Agreement in this case provides HCSO a level of independence. HCSO is authorized to develop its own policies and procedures regarding child protective investigations (Dkt 202-10 at 21), the child protective investigators and supervisors are under the control of HCSO (*Id.* at 23), and HCSO is authorized to subcontract investigations relating to child neglect and assumes full responsibility for safety decisions made by its subcontractor (*Id.*). This factor weighs against finding arm of the state status.

### *Source of Funds*

This factors weighs in favor of arm of the state status. The funds for child protective investigation services division are derived solely from the state, which Plaintiff does not contest. (Dkt. 202-10 at 9).

### *Financially Responsibility for Judgments*

Major Bullara, a former Major in the CPI Division, avers that any judgment "would be paid strictly out of the DCF grant money provided this fiscal year" because "the office's county money is not allowed to be utilized in such a circumstance." (Bullara Aff. ¶ 5, Dkt. 189-56). Notwithstanding, Florida law provides that the Grant Agreement funds are for "providing child protective investigations" and makes no reference to judgments.[19]

The Grant Agreement does not specify who is liable for a judgment against HCSO while performing under the Grant Agreement. And the Eleventh Circuit recently recognized that "'no provision of Florida law provides state funds to a Florida sheriff to satisfy a judgment against the sheriff.'" *Stanley*, 843 F.3d at 930 (quoting *Hufford v. Rodgers*, 912 F.2d 1338, 1342 (11th Cir.

---

[19] "Funds for providing child protective investigations must be identified in the annual appropriation made to the Department of Child and Families, which shall award grants for the full amount identified to the respective sheriffs' offices." Fla. Stat. § 39.3065(3)(c).

1990)). Finally, the HCSO acknowledges that it is self-insured. (Dkt. 202 at 39). Based on the record, this weighs against arm of the state status. Considering the record and weighing the relevant factors, I find that the HCSO is not entitled to Eleventh Amendment immunity. *See Stanley*, 843 F.3d at 926.

**III. Conclusion**

The HCSO's Motion for Summary Judgment (Dkt. 189) is **GRANTED** on Plaintiff's individual ADA claim (Count II), Rehabilitation Act claim (Count V), and § 1983 claim (Count IX). The motion is **DENIED** on Plaintiff's associational ADA claim (Count II).

**DONE AND ORDERED** this ___15___ day of March, 2017.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record